545 So.2d 1099 (1989)
Marie Saab KELLEY
v.
The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. d/b/a A & P Food Stores.
No. 89-CA-51.
Court of Appeal of Louisiana, Fifth Circuit.
June 7, 1989.
Elsie B. Halford, Metairie, for plaintiff/appellant.
Robert E. Peyton and Susan A. Zeringue, Christovich & Kearney, New Orleans, for defendant/appellee.
*1100 Before BOWES, GAUDIN, DUFRESNE, WICKER and GOTHARD, JJ.
WICKER, Judge.
This appeal arises from a suit filed on behalf of plaintiff/appellant Marie Saab Kelley (Kelley) against The Great Atlantic & Pacific Tea Company, Inc. d/b/a A & P Food Stores (A & P) for damages allegedly resulting from a fall in that store. The trial court rejected Kelley's demand. Kelley now appeals. We reverse.
Kelley, who was 86 at the time of trial, filed suit against A & P for injuries she alleges resulted from a fall while she was shopping on February 1, 1984 in the produce section of that store. She contends she fell on a spinach leaf and suffered a fractured right knee. A spinach leaf approximately one and one-half inches in size was on the bottom of her shoe. She also asserts on July 5, 1986 her right knee, which had been weakened from the 1984 accident, gave out causing her to fall and injure her right hip, right elbow and left wrist. The trial judge concluded Kelley had not met her burden of proving her injuries were caused by the negligent acts or omissions of A & P. Kelley appeals specifying the following specification of error:
That the trial judge failed to apply special evidentiary rules peculiar to "slip and fall" cases. Once he found plaintiff proved a piece of spinach was on the sole of her shoe after she fell near the spinach display, he failed to recognize the presumption of negligence the law creates in her favor. Having erred thus, the trial court did not determine whether defendant produced sufficient evidence to exculpate itself from liability.
Kelley testified she and her nephew, Raymond Nohra (Nohra), went to the A & P grocery store on the morning of February 1, 1984. While Nohra shopped nearby at the meat counter, she shopped in the vegetable section. Kelley testified:
... I walked in and went to the side of the vegetable counter and then I told [Nohra] to go ahead of me because he was going for the meat, the meat market, and I says, "Well, I'll look at the vegetable stand and I got what I wanted from the vegetable stand and headed all the way across and I saw the spinach stand and I says, "oh, [Nohra] loves spinach, I'm going to buy some spinach." So, I picked up two bunches of spinach off of the counter and I turned this way and I put them in my basket and down I went.
She further testified the basket was in front of her and that:
... I tiltedwell, just before I put the spinach in the basket I tiltedI went to put the spinach in the basket and I tilt a little bit like that (indicating) and I fell backwards ... and I fell flat on the floor.
She stated she fell on a spinach leaf which was approximately 1-1½ inches. It was on the heel of her shoe. She testified she fell "the same minute, the same second" as she picked up the two bunches of unpackaged, but tied spinach. She denied falling as she walked to the spinach counter.
During cross-examination the following colloquy occurred:
Q. Well, didn't you tell me that it happened in the morning because you assumed that they had wet the spinach down and because the spinach that you slipped on
A. When they put it on the counter, I don't know, because I wasn't there.
Q. Yes, ma'am.
A. But everything was already stacked up when I got there, and I know it was between 9:00 and 12:00.
Q. But, didn't you tell me in your deposition you were there about 9:00 o'clock?
A. I don't remember at 9:00 o'clock, but I know it was before noon.
Q. Okay. Page 8, Counsel. "Question: Do you know how long that piece of spinach had been on the floor? Answer: Well, it looked like it was very fresh because it was damp. Well, you know how they do, they sprinkle water all over the vegetables every morning, every morning, and I was there around 9:00 o'clock." [Emphasis added].
*1101 Do you remember saying that?
A. I don't remember.
She was taken by ambulance to a hospital and later underwent surgery for a fractured right knee. Approximately two years later, she fractured her hip while walking into her bathroom. She related the cause of the second fall as resulting from her weakened right knee.
Nohra testified he lived with his aunt. On the morning of February 1, 1984 he accompanied Kelley to the A & P. They went directly to the A & P from their home that morning. While he went to the meat section, she shopped, pushing the basket, in the vegetable section. He heard a scream, turned, and observed his aunt "laying flat on her back on the floor." He saw a piece of spinach on the bottom of her right shoe. He thought the leaf was on the shoe sole. Nohra stated Kelley was located "no more than a foot away" from the spinach counter. He did not recall how the spinach was packaged. He was not asked whether he observed any spinach on the floor of the store.
Chris Campbell (Campbell), a co-manager of A & P at the time of the 1984 accident, testified. He stated he was notified of the fall by Tammy Tedley, an employee in A & P's floral department. At trial he stated the accident happened "about 12:00, a little after 12:00." He completed an accident report and noted on the report the time of the accident as being 12:20 p.m. The following colloquy occurred between the trial judge and Campbell:
THE COURT:
Mr. Campbell, let me ask you a question. When you arrived at the produce counter where Mrs. Kelly [sic] had fallen, did you look at the floor in the area which she had fallen?
THE WITNESS:
Yes.
THE COURT:
What did you see?
THE WITNESS:
Well, she was laying down on the floor, so I didn't see anything on the floor at the time.
THE COURT:
Did you look all around the area?
THE WITNESS:
Where she was at, yes.
THE COURT:
Did youwere you there when she was taken from the store in the ambulance?
THE WITNESS:
Yes, sir.
THE COURT:
Did you look at the floor again where she had fallen after they had taken her in the ambulance?
THE WITNESS:
Yes.
THE COURT:
What did you see there?
THE WITNESS:
I still couldn't find anything on the floor at that time you know.
THE COURT:
That's all.
Campbell further stated he did not check Kelley's shoe soles.
Rickey J. Silvey (Silvey), A & P's produce manager in 1984, testified the vegetable display is set up usually from 5:00 a.m. to 9:00 a.m. He described the set-up process as follows:
... We have a process that when we receive the greens, the leafy items on the day of delivery, we throw them in the back room and we have a crisping program where we wash them and soak them in a sink oflike room temperature water and you leave it in the cooler overnight, you know, and that freshens the merchandise ... a certain amount of [vegetables] would be taken off at the end of the sales day and then you know put back in the tub and in the cooler to be redisplayed the next day.
On February 1, 1984 a utility clerk was also employed by the store on that day. He began work at 3:00 a.m. until 12:00 p.m. His duties were "general maintenance and cleaning around the store ... as well as the floor, he swept and mopped the floor." Campbell further stated "[t]he last thing he did before he left every day was sweep *1102 the entire store down." Campbell was not asked whether the floor had been swept or mopped on the date of the incident. Instead, he vaguely stated "[w]hoever would have been out there on the floor at the time was responsible to maintain the floor." [Emphasis added] When asked to be specific about the cleaning procedures on the date of the incident he again responded vaguely:
Q. Well, do you know that actually on that morning an inspection was made?
A. Yes.
Q. Tell me what time the inspections were made and by whom?
A. Well, they would have been inspecting it throughout the day as they were working. [Emphasis added].
Q. No. But specifically, do you recall who inspected that aisle on that day?
A. Well, Ricky Silvey would have inspected it on that day. [Emphasis added].
Q. Do you know that he did that?
A. I don't know exactly for a fact. I inspected it as well. [Emphasis added].
Q. Isn't it true that actually there was no written policy and none of the employees were assigned at the time to make these inspections?
A. There's no written policy. There is a policy of inspecting it.
Q. No, I know there is a policy. But, isn't the policy this, that you tell people as they're working and walking around to be on the lookout for things that are on the floor?
A. Well, that's one of the policies, yes.
Q. But there's no schedule about who makes what inspection at what time?
A. Other than myself or the manager really.
Q. Okay. And, do you have anydo you keep any recores [sic] of when the inspections are made so that you'll know the inspection actually was made?
A. No.
Q. You're really telling me what people are supposed to do.
A. (No audible response)
Q. You're telling me what you think people are supposed to do, but you don't know what they do.
A. As far as the manager I do, because I inspect behind them.
Q. Tell me what time inspections were made that day. Tell me what times between 9:00 and 12:00 when the inspections were made and by whom.
A. Okay. Well, I would have come in at 9:00, so I would have inspected the store at 9:00, and then every hour thereafter. [Emphasis added].
Q. Would it ge [sic] exactly at 9:00?
A. No, not always exactly at 9:00.
Q. Well, how do you know that the inspections areit's a general direction, isn't it? You say inspect every hour. How do you know when the inspections were made?
A. Well, I know within at least every hour I would have inspected it, I know that. [Emphasis added].
Q. Someone would have inspected ever [sic] hour, but you don't know who.
A. Well, I would have. [Emphasis added].
Thus, Campbell only testified according to what he "would" have done. He never testified that either he or anyone actually did inspect or clean that day.
Carole Melancon (Melancon), a scanning coordinator for A & P at the time of the 1984 accident, testified as follows:
I was doing price-checking on an aisle that was close to the produce display and at that time I noticed that there was a lady across from me looking at some produce, and then the next thing I knew I heard a sound as if someone had fallen and also a moan at the same time ... she was on the floor.
She further stated the accident happened around noon. She did not see anything on the floor. She also did not look at Kelley's shoes or the back of her dress. Although she knew Richard Ricard, the utility man, had the duty of sweeping floors, she did not recall whether she saw Ricard sweeping the floor that day. Later she stated she did not see him sweep on that particular day.
*1103 Joseph Pellegrin testified he was produce clerk on the date of the accident. He had no knowledge of the accident. While he stated he had responsibility for cleaning spillages, he was never asked whether he had in fact cleaned the floor of the produce section that day.
Silvey further testified he returned from his lunch break on February 1, 1984 at 12:13 p.m. When he punched in at 12:13 p.m. he inspected the produce section. However, Silvey was never asked; nor did he state the results of his inspection. He never stated the produce floor was clear of spillage; he had no recollection of the accident.
In oral reasons for judgment, the trial judge explained:
there's no serious question in my mind that Mrs. Kelly [sic] suffered serious injuries as a result of a fall at A & P in February of 1984. The injuries were painful and severe and disabling. The question in my mind is whether or not the plaintiff has met the burden of proving the preponderance of the evidence, that her injuries were caused by the negligent acts or omissions of the defendant A & P. The only evidence I've heard with regard to that issue is that she found a small piece of spinach on the sole of her shoe. I don't know where the spinach came from, I don't know how long it had been on her shoe, and I don't know whether that's what caused her to fall.
There's some evidence that she had been treated back in 1979 for some condition to her knee, that she may have had some history of falling before or some weakness in her knees, and that could as easily as the spinach been the cause of her fall in A & P. So, it's my decision that she has not met her burden of proving by a preponderance of the evidence that her injuries were caused by the defendant, and, therefore, the plaintiff's case is dismissed at her cost.
We do not agree with appellant's contention the trial judge required Kelley to "prove (1) where the spinach came from and (2) how long it was on her shoe." Considering the trial judge's oral reasons for judgment along with his questioning of Campbell regarding whether Campbell observed a foreign substance on the floor, we conclude the trial judge was concerned with whether the spinach leaf was ever on the floor of the store.
As explained by the Louisiana Supreme Court in Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976) at 488:
The action is based on Article 2315 of the Louisiana Civil Code. It provides in pertinent part:
"Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it."
Under this article, the elements of a cause of action are fault, causation, and damage. Eschete v. City of New Orleans, 258 La. 133, 245 So.2d 383 (1971). The term fault includes but is not restricted to negligence. LSA-C.C. Art. 2316 ...
The duty of a store owner to protect his customers from foreign substances on the floor is one of reasonable care under the circumstances. Reasonable protective measures, including periodic inspections, must be taken to keep the aisles and floor free of substances or objects that may cause customers to fall. Kavlich v. Kramer, La., 315 So.2d 282 (1975); Tripkovich v. Winn-Dixie of Louisiana, Inc., La.App. 284 So.2d 80 (1973); Fontanille v. Winn-Dixie Louisiana, Inc., La.App. 260 So.2d 71 (1972), cert. denied, 261 La. 1064, 262 So.2d 44 (1972); Prosser, Law of Torts, Section 61, pp. 392-393 (4th ed. 1971). The circumstances that determines [sic] the reasonableness of protective measures include the type and volume of merchandise, the type of display, the floor space utilized for customer service, the nature of customer service, and the volume of business. As we recently noted, the self-service grocery system requires customers to focus their attention on the shelves and to handle merchandise. The system increases the risk of harm from *1104 objects dropped on the floor by customers and, correspondingly, the duty to minimize the risk by frequent inspections and cleanups. See Kavlich v. Kramer, supra; Prosser, Law of Torts, Section 56, p. 349 (4th ed. 1971). [Emphasis added].
In McCardie v. Wal-Mart Stores, Inc., 511 So.2d 1134, 1134-1135 (La.1987) the Louisiana Supreme Court recognized plaintiff bears the burden of proving "that a foreign substance on the floor caused her to slip, fall, and sustain injuries," and that once plaintiff met her burden, "the burden of proof shifts to the owner of the store to exculpate itself from the presumption that it was negligent." The McCardie court further stated "[m]erely proving adequate clean up procedures is insufficient to prove a spill was not caused by one of the store's own employees." Id. at 1136.
The Louisiana legislature recently clarified the jurisprudence in this area by Acts 1988, No. 714, Section 1, eff. July 18, 1988. Although not in effect at the time of Kelley's accident, new La.R.S. 9:2800.6 now provides:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
D. "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
Recently, the Fourth Circuit has held:
Although La.R.S. 2800.6 is not to be applied retroactively, its enactment supports our belief that the holding in McCardie was a deviation from settled principles of law.
Brown v. Schwegmann's Giant Supermarkets, 534 So.2d 1344, 1347 (La.App. 4th Cir.1988).
The Fourth Circuit's holding was reversed by the Supreme Court in Brown v. Schwegmann's Giant Supermarkets, 536 So.2d 1227, 1227 (La.1989) when it held:
Judgment of the Court of appeal is reversed. Judgment of the district court is reinstated. See McCardie v. Wal-Mart, 511 So.2d 1134 (La.1987).
Since the McCardie rule applies in this case, even had defendant met its burden in proving adequate clean-up procedures, it did not meet the burden imposed by McCardie in proving the presence of the spinach leaf on the floor "was not caused by one of the store's own employees." McCardie, supra at 1136.
Causation is a question of fact and a trial court's finding will be upheld unless clearly wrong or manifestly erroneous. Youngblood v. Sanders, 513 So.2d 521 (La. App. 2nd Cir.1987). See also Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). The trial judge based his conclusion Kelley had not proven causation on the finding that "[t]he only evidence... to that issue is that she found a small piece of spinach on the sole of her shoe." His failure to find that slippage on the leaf caused her to fall is clearly wrong and manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The trial judge was correct in concluding she had spinach on the sole of her shoe. However, *1105 it was also uncontroverted that the spinach was wet. Silvey testified the vegetables are freshened in water before being set-up. Thus, Kelley could not have carried wet spinach into the store; she could only have picked up the spinach from the floor of the A & P.
The trial judge, after concluding plaintiff did not meet her burden proving the spinach caused her to fall, mentioned there was "some evidence" of treatment in 1979 for a knee condition and that "she may have had history of falling" and that "that could as easily as the spinach been the cause".
The trial judge went outside the record to form the conclusion a prior knee condition may have caused the fall. There is no question of one cause over another since no one testified her knee gave her trouble walking the day of the accident or at any time near the date of the accident. Dr. Courtney Leonard Russo, an expert in medicine with a subspecialty in orthopedic surgery and Kelley's treating physician, was the only medical expert to testify. He noted a kneecap problem in 1979 but no history of an accident or fall.
There is no evidence that Kelley's fall was caused by anything other than a foreign substance on the floor.
In Edwards v. Piggly Wiggly Operators, 401 So.2d 493, 494 (La.App. 2nd Cir.1981) the court explained:
It is axiomatic that a storekeeper owes an affirmative duty to those who use his premises to exercise reasonable care to keep his floors in a safe condition. Kavlich v. Kramer, 315 So.2d 282 (La.1975).
Upon proof that a foreign substance was on the floor at the time plaintiff entered, that plaintiff stepped on this foreign substance, and that it caused her to slip and fall, the burden shifts to defendant store owner to go forward with evidence to exculpate itself from the presumption that it was negligent. Kavlich v. Kramer, supra; Smith v. Winn-Dixie Stores of La., Inc., 389 So.2d 900 (La.App. 4th Cir.1980).
The testimony of A & P's employees is vague concerning inspection and clean-up procedures. We conclude A & P has not met its burden of proving it was reasonably prudent in its exercise of duty and care owed to a customer shopping in a self-service produce section containing wet spinach. See Kavlich, supra. See also McCardie, infra and the discussion therein.
The trial judge, having concluded the fall in A & P was not caused by the defendant, A & P, necessarily did not reach the issue of damages. Having found reversible error in the trial judge's conclusion, we are mandated to conduct an independent review of the record. Gonzales v. Xerox, 320 So.2d 163 (La.1975).
DAMAGES: A & P FALL
Only one expert testified at trial. His testimony is uncontroverted that Kelley suffered a displaced fracture of the right distal femur in the knee joint as the result of her fall. She had surgery in which a blade plate, a screw, nuts and bolts were placed into the femur. She was hospitalized for 20 days. Upon discharge from the hospital she wore a leg-long cast and was prescribed medication for pain. Approximately two months after surgery the cast was removed and she was placed in a soft-splint. A program of physical therapy exercises were implemented. She was also using a walker. Kelley suffered traumatic arthritis from the injury. While she had previous osteoarthritis in the joint prior to the fall, Dr. Russo was unable to determine the proportion of each type of arthritis. By August 8, 1985, approximately one and one-half years after the accident, Kelley had still not reached "maximum cure." On June 9, 1986, approximately two years and four months after the accident she still had tenderness of the knee. Kelley testified as a result of her injuries she required household help.
BATHROOM FALL: CAUSATION
Defense counsel argues in brief Kelley did not prove by a preponderance of the evidence that her later fall in the bathroom was a result of the injuries sustained in the A & P fall. He asserts that although plaintiff testified she fell because her knee gave way, there is contradictory evidence she *1106 slipped. Furthermore, he cites for support for his contention causation has not been proven, Dr. Russo's deposition testimony wherein he stated he really did not know what happened at home, and the history given must be correct in order to make a causal connection.
Kelley testified at trial that about two years after her fall in A & P, she "was walking into the bathroom and [her] knee gave way and down [she] went again, just flat on [her] back." Dr. Russo testified on July 5, 1986 he saw Kelley at a hospital emergency room. He testified the emergency report stated, "Nephew states that patient fell injuring her right hip, her left wrist and he right elbow. Patient slipped in the bathroom and sustained injury to the left wrist, right elbow and right hip." Dr. Russo further stated he probably did not take a detailed history of the accident. Nevertheless, he testified there was no doubt her leg was weak. Kelley "had a weakened extremity which can give way at any time." Furthermore, he stated he thought the weakened leg "gave out a little bit which caused her to slip and fall and injured [sic] her hip."
There is no conflicting medical testimony regarding Dr. Russo's determination of causation for the bathroom fall. We conclude plaintiff has met her burden of proving her weakened leg, which had been weakened by the fall in the A & P, caused her to fall in the bathroom. She was still under the care of Dr. Russo at the time and he expected the leg to be weak on the date of the bathroom incident. She had surgery wherein Dr. Russo performed an open reduction internal fixation of the right hip. She was again hospitalized following the second injury for a period of 12 days. Thereafter, she was transferred to a skilled nursing unit for two to three weeks where she attended physical therapy on a daily basis. From 1984 to trial (1988) she consistently showed weakness and atrophy in the quadricep and thigh muscles.
Dr. Russo further testified Kelley must continue to use her walker. He gave a total impairment rating of 35%. Her special damages amounted to $51,185.00. Kelley's testimony reflects a drastic change in her life style following the fall in the A & P. Before the accident, she cooked, shopped and attended garden club functions. The quality of her life has been significantly impaired. She is no longer independent. Under these circumstances, we find Kelley's general damages to be assessed at $125,000.00. See Bossier v. De Soto General Hospital, 442 So.2d 485 (La. App. 2nd Cir.1983), writ denied 443 So.2d 1122 (La.1984), wherein the court found no abuse of discretion in an award of general damages of $125,000.00 for a 35% disability to plaintiff's right leg coupled with a drastic change in life-style.
Accordingly, for the reasons stated, the judgment dismissing plaintiff's suit is reversed and IT IS ORDERED that judgment be and is hereby rendered on behalf of Marie Saab Kelley against The Great Atlantic & Pacific Tea Company, Inc. d/b/a A & P Food Stores in the amount of $125,000.00 general damages and $51,185.00 special damages, with legal interest from judicial demand and all costs.
REVERSED AND RENDERED.
DUFRESNE and GAUDIN, JJ., dissent.
GAUDIN, Judge, dissenting.
I respectfully dissent, being of the opinion that the record is supportive of the trial judge's findings regarding causation. The majority is substituting its factual determinations for those of the trial judge.
DUFRESNE, Judge, dissenting.
I respectfully dissent. The question here is whether the plaintiff has proven that her fall was caused by the "small piece of spinach" on the sole of her shoe. The trial judge in his reasons for judgment held that she had not met this burden, and I agree.
Under these circumstances, we should not, under our law, disturb this evaluation on appeal. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
The record supports the trial judge and his ruling here. Accordingly, I would affirm the dismissal of the plaintiff's suit and *1107 the finding that the defendant was not negligent.