WICKER, Judge.
Kathy A. Suhre appeals a judgment in her favor, but finding her comparatively negligent. The defendants, Jefferson Parish School Board, Peggy Wilt, and Pelican State Mutual Insurance Company, have answered and cross-appealed. The issues are allocation of fault and damages. We modify in part and, as modified, affirm and render.
Miss Suhre and a companion were riding bicycles east on Metairie Road with Miss Suhre in the lead. A Jefferson Parish School Board bus driven by Peggy Wilt turned right onto Magnolia Street. Miss Suhre tried to go around the bus to the left and crossed into oncoming traffic, where she was hit and thrown from her bicycle. She suffered a broken leg and pelvis, along with assorted cuts, abrasions, and bruises.
Miss Suhre sued the School Board; Miss Wilt; and the School Board’s insurer, Pelican State. These defendants third-partied Babst Mechanical, Inc.; Kenneth Diaz; and U.S.F. & G. Insurance Company, the owner, driver, and insurer respectively of the pickup truck that hit Miss Suhre. The School Board, Miss Wilt, and Pelican State later dismissed the third-party defendants. Charity Hospital of Louisiana in New Orleans intervened for Miss Suhre’s medical expenses.
The threshold issue is whether any action by Miss Wilt caused Miss Suhre a sudden emergency, prompting her to try to pass the turning bus on the left. The testimony of the witnesses is in conflict, and the judge resolved this factual issue by finding Miss Suhre sixty percent at fault and the defendants forty percent at fault.
Wilt did drive her bus in an erratic manner and did make too wide of a turn from Metairie Road onto Magnolia Drive without using her turn signal. Wilt’s actions were a cause of plaintiff’s accident.
[Pjlaintiff was following Wilt’s bus too closely. And, plaintiff’s actions were also a cause of her accident.
Miss Suhre complains (1) the judge misunderstood and misinterpreted the facts resulting in his erroneous assessment of sixty percent fault to her, (2) he failed to award damages for lost income and the cost of training for another career, and (3) he failed to award damages for cosmetic deformity and future medicals to correct the deformity. The School Board, Miss Wilt, and Pelican State, on their cross-appeal, complain that the judge assessed fault to them when none existed.
ASSESSMENT OF FAULT
May 10, 1988, was a clear, warm, sunny day. Miss Suhre and her then-boyfriend, David Buquoi, Jr., left her Metairie house on bicycles belonging to her. They stopped briefly at Metairie Playground and then headed foi Metairie Road on Hollywood *720 Drive. They stopped at Metairie Road, turned right, and set out going about ten to fifteen miles per hour to City Park. They were riding at the far right of their lane about one foot from the curb.
Miss Wilt was in the same lane going in the same direction. She had turned onto Metairie Road from Fagot Street, planning to turn right further along on Magnolia Street in order to pick up children from Haynes Middle School. Her bus was in good operating condition, and she had checked the turn indicators the morning of the accident.
About three cars behind the bus, Ronald Heidenreich was driving his mini-van in the same direction and at the same speed as the bus. He was especially watching out for the bus, since it had pulled out of Fagot Street without stopping at the stop sign and had been proceeding erratically since that point.
The traffic signal at Metairie Road and Magnolia Street was red but about to turn green at this point. The bicyclists, the school bus, and the mini-van were all going about five miles per hour waiting for the light to change. Miss Wilt then made a right turn onto Magnolia Street. Miss Suhre, who was the lead bicyclist, braked and veered to the left into oncoming traffic. Miss Wilt heard a sound but didn’t realize it had anything to do with her bus. However, she looked and saw Miss Suhre on the ground, so she completed her turn and pulled over, thinking she would be able to at least call an ambulance on her CB radio. She learned that a neighbor had already called for help, so she went on her way to pick up the students.
This much of the story is uncontested. There is serious disagreement, however, concerning whether the bus’ right turn indicator and brake lights were on, whether Miss Suhre was behind or alongside the bus, whether the bus had previously passed the bicyclists on Metairie Road, whether Miss Wilt was or should have been aware of the presence of the bicyclists, and whether Miss Suhre had a safer alternative available to her.
Miss Wilt testified that she couldn’t be sure she would have been able to see a bicyclist between her bus and the curb on the right side. She didn’t recall passing the bicyclists at any point, but she thought she would remember it if she had. She didn’t know how fast she was going when she made her turn, but she generally made that turn going about five miles per hour. She testified that she checked her rear view mirrors constantly and that her turn indicators were operating. She knew they were on because she always used them. There were no passengers on her bus at the time of the accident.
Mr. Buquoi testified the bus passed him between Holly Drive, one block before Magnolia Street, and Magnolia Street, overtaking Miss Suhre as she was getting to the comer. Miss Suhre was about even with the back of the bus when it started a sharp right turn in Miss Suhre’s path. Miss Suhre was about fifteen or twenty feet from the corner at this point. The bus was “right on her”, so she veered to the left “to try to buy some time ... so she could continue on around the bus. It was either that, or ... it looked like she was headed into the bus.” The whole episode took only two or two-and-a-half seconds. The bus didn’t stop or slow down but “kind of whipped around the corner”, making its turn about twenty or twenty-five miles per hour. He didn’t see either turn signals or brake lights on the bus. When Miss Suhre saw the bus overtaking her, she started to slow down. She seemed to be hitting the brakes and trying to catch the ground with her feet at the same time.
Mr. Heidenreicher noticed the bicyclists near Magnolia Street and saw Miss Suhre pass Mr. Buquoi. He saw the bus slow down nearing the signal light and then accelerate and make a sharp turn, “a very hurried aggressive turn....” Cars were coming from Magnolia Street onto Metairie Road, and he thought maybe the bus didn’t have a lot of room to make the turn. He also thought the bus’ rear wheels went up onto the curb and that the driver was in an awfully big hurry. He testified that the bus absolutely did not signal its turn; this was one of the first things that registered, *721 and he said to himself, “God damn driver didn’t signal to make the turn.” At this point Miss Suhre was on the side behind the bus, “out of a motorists’ way.” His impression was that the bus overtook the bicyclist. “The bus was in front of her, such that when she gets to the corner, and the bus makes its turn, she has no opportunity to do anything, other than either crash into the bus, go over the high curb, or else veer to the left.” The bus cut her off.
On cross examination Mr. Heidenreicher testified that Miss Suhre was about fifteen or twenty feet from the corner when all this happened. She was alongside the bus towards the back, but he couldn’t be sure how many feet from the front of the bus she was. It all happened in a couple of seconds. He seemed to concede that a bus would have to be somewhat past the corner itself in order to pivot into its turn, but he testified that he really didn’t know about driving a school bus. He also admitted that when he first saw Miss Suhre she was behind the bus and probably going a little faster than the bus. He believed she didn’t have time to use her brakes and that the curb was too high for her to mount at that point. He also thought Miss Suhre wouldn’t have been able to see the rear turn signal from where she was and didn’t know if she would have been able to see the turn signal on the front fender. He reiterated that Miss Suhre took the only action she could have to avoid the bus.
Miss Suhre testified that she was in the lead about forty feet ahead of Mr. Buquoi going down Metairie Road. The bus passed her about twenty-five feet from the corner, and she would have been able to see the front signal if it had been flashing. It passed her completely and turned very briefly, she was behind the bus instead of along side it. Miss Suhre testified that she was in the lead about forty feet ahead of Mr. Buquoi going down Metairie Road. The bus passed her about twenty-five feet from the corner, and she saw it to her left without any signals. She would have been able to see the front signal if it had been flashing. The bus passed her completely and turned quickly in front of her about ten or fifteen feet from the corner. “The bus passed me, and I saw the back of the bus for a brief moment. And then the next thing I know, it was across the front of me, the side of the bus, and that’s when I veered off to the left.” She stopped pedaling, applied the brakes, and veered to the left. She testified, “I just did what was natural. I didn’t go to the right because there was the curb, and signs, and polls [poles], and I didn’t go straight because of the bus.”
Colonel Joseph Andre testified for the defendants as an expert in traffic reconstruction and safety. He had visited the accident scene and taken measurements and photographs. His measurements showed the distance from Holly Drive to Magnolia Street to be one hundred ninety-five feet. He testified that the bus could not possibly have made this turn going more than five or ten miles per hour. Col. Andre had personal experience driving buses. He also testified that, if the bus had passed Miss Suhre in the middle of this block going twenty-five miles per hour, she could not have possibly caught up to it at the corner, so the bus must have slowed down and the brake lights must have gone on. He concluded that, rather than the bus overtaking Miss Suhre at the intersection, she must have overtaken the bus.
I think that she put herself in a position of jeopardy by doing that. This is a very large vehicle, that school bus, if it passed her safely, and was ahead of her, she should have stayed behind it at that point, especially through the intersection. She would not be permitted legally to pass on the right through the intersection. She would not be permitted legally to pass on the right through the intersection, nor at any place really. Nor would she be permitted to pass at an intersection in this particular situation. And I think she should have followed at a safe distance, at that particular time, under those circumstances.
He believed that the only deviation from traffic safety was Miss Suhre’s allowing herself to get too close to the rear of the bus. “I think that that’s the major problem that created the emergency situation *722 that caused her to swerve sharply to the left.”
There are several applicable provisions of the Highway Regulatory Act which outline the responsibilities of overtaking and overtaken vehicles, vehicles passing on the right, following vehicles, turning vehicles, and bicycles. La.R.S. 32:73, 32:74 B, 32:81 A, 32:104 A and B, and 32:194. Clearly, both Miss Suhre and Miss Wilt violated the rules of the road.
The Supreme Court has given us guidance for evaluating comparative negligence in Watson v. State Farm Fire and Cos. Ins. Co., 469 So.2d 967 (La.1985).
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
469 So.2d at 974. After weighing the evidence in light of these factors, we cannot say the judge was clearly wrong in assigning sixty percent of the fault to Miss Suhre and forty percent to Miss Wilt. There were two permissible views of their conduct, and the judge’s choice of one of them over the other does not constitute manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); Williams v. Louisiana Power & Light Co., 590 So.2d 786 (La.App. 5th Cir.1991). While Miss Suhre may have been presented with a sudden emergency, that emergency was at least in part of her own making. That fact distinguishes this case from those cited by her, such as Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3rd Cir.1990), writ denied 565 So.2d 450 (La.1990).
We affirm the judge’s finding that Miss Suhre was sixty percent at fault and Miss Wilt forty percent at fault in causing this accident.
DAMAGES
On the morning of her accident, Miss Suhre had taken her last examination prior to receiving a B.A. degree from Loyola University in communications. She hoped to get a job as a production assistant in television. She was thirty years old at the time of the accident; and except for five or six years since high school graduation, she had worked part time and gone to school part time. She had already sent out some resumes in search of a position as production assistant, but she had not yet received a job offer.
She believed that, following her injury, she would not be able to perform the hard physical activity associated with being a production assistant, so she enrolled in a registered nursing course at William Carey College. The parties stipulated that she would be through with that course by August of 1993, and that she would suffer no economic loss past December 31, 1993.
At the time of trial, Miss Suhre was working in a clerical position part time at Ochsner Clinic. She had gone to Saudi Arabia as a part of Desert Shield in January of 1991, and worked full time. However, her assignment was very undemanding and allowed her plenty of time to sleep, write letters, and read books.
Miss Suhre claimed the loss of projected income as a television production assistant as well as the $17,000.00 cost of books and tuition to pursue her alternative career as a registered nurse. The judge found her claim for lost income speculative.
The field of broadcasting is highly competitive. There was no evidence that, but for the accident, plaintiff, as a student in communications, could have, or would, have gotten the specialized job that she wanted.
With regard to the claim for educational expenses, he found that
*723 even though plaintiff may not have been able to perform the physically demanding tasks required as a Production Assistance [sic], there is insufficient evidence to prove that plaintiff could not have pursued a career in another area in the field as multi-faceted as communications. Thus, there is insufficient evidence to prove that she had to enter nursing school because of the accident.
The judge did award Miss Suhre $75,-000.00 for her past, present, and future mental and physical pain and suffering, and $11,346.05 for her medical bills.
The judge is granted much discretion in awarding damages, and we do not believe his finding that Miss Suhre’s economic losses were speculative abused that discretion. Her W-2’s for 1986 show an income of $2,433.00 and for 1987 an income of $1,533.00. There are no W-2’s for 1988, the year of the accident. Her income for 1989 and 1990, without including her military pay, was $4,742.00 and $7,948.00, respectively, according to the W-2’s for those years.
Bruce C. Payne, Ph.D. evaluated her economic loss based on Miss Suhre’s potential earnings as a production assistant as around $90,000.00 through 1993, noting an average starting salary of $21,270.00 and somewhat less locally. He noted that the nationwide job outlook was excellent. Hey-ward X. Johnson, M.R.C., a rehabilitation expert, opined Miss Suhre would be able to return to work at a medium level occupation, lifting up to fifty pounds. However, he noted an inconsistency between her pain level reporting and her pain-related behavior, indicating that she was abusing the pain level reporting scale. Miss Suhre had told him she was not interested in locating outside the Greater New Orleans area. He felt she could not handle the job of production assistant if the job exceeded the medium level weight limits. In his opinion Miss Suhre ought to be able to start as a registered nurse at a salary range of $27,-000.00 to $32,000.00. Mr. Johnson had called around locally to find that production assistants in New Orleans started at $19,-000.00.
We agree with Miss Suhre that earning potential is the proper measure of loss, Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4th Cir.1990), writ denied 568 So.2d 1062 (La.1990). The evidence, however, supports a conclusion that her earning potential was actually higher in her alternative career as registered nurse than it would have been had she continued toward a career as a production assistant.
We do not believe the judge abused his much discretion in denying Miss Suhre an award for economic losses, and we affirm this portion of the judgment. See Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Miss Suhre also argues that the judge failed to award compensation for cosmetic deformity to her leg and for the cost of revising the scar. We agree and believe that this failure is clearly wrong.
We have reviewed the photographs of Miss Suhre’s leg; and we can see the considerable scarring of her kneecap, the puncture wound scar on her calf, and the herniated muscle in her calf. The knee scars have already been revised. John Finley, M.D., her plastic surgeon, testified that the scar on her calf could be improved at a total cost of $2,000.00. He felt that plastic surgery would not improve the herniated muscle and might in fact make it worse. We modify the judgment in Miss Suhre’s favor to add $2,000.00 for future medical treatment.
To assess the value of Miss Suhre’s disfigurement, it is appropriate for us to look at other similar awards. Coco v. Winston Industries, Inc., supra. Pitts v. Bailes, 551 So.2d 1363 (La.App. 3rd Cir.1989), writ denied 553 So.2d 860 (La.1989) and 556 So.2d 1262 (La.1990), awarded $62,-500.00 in damages for permanent disability and disfigurement to a twenty-year-old whose leg was amputated just below the hip. The First Circuit, Johnson v. City of Baton Rouge, 506 So.2d 882 (La.App.1987), affirmed a $20,000.00 general damage award for the pain and disability of a broken leg and ankle, puncture wounds and lacerations of the legs, and a head contusion, noting that it was at the lower range *724 of acceptable awards. This circuit awarded $125,000.00 in general damages for a thirty-five percent disability to the right leg resulting from a leg fracture at the knee joint requiring surgery, all of which subsequently led to an additional fall which injured the plaintiff’s hip. Kelley v. Great Atlantic & Pacific Tea, 545 So.2d 1099 (La.App.1989), writ denied 550 So.2d 629 (La.1989). In Baker v. City of New Orleans, 555 So.2d 659 (La.App.1989), writ denied 558 So.2d 603 (La.1990), the Fourth Circuit raised the general damages to a twenty-year-old bicyclist who had a fractured tibia resulting in a twenty-percent-disability to the knee and a four or five-inch scar from $45,000.00 to $100,000.00.
We believe that an additional $20,000.00 will compensate Miss Suhre for the cosmetic deformity to her leg, and we modify the award in her favor to that extent.
We modify the judgment in favor of Kathy Suhre and against Peggy Wilt, the Jefferson Parish School Board, and Pelican State Mutual Insurance Company, to include $2,000.00 for future medical expenses and $20,000.00 for permanent cosmetic disfigurement. The total award is $108,-346.05. This must be reduced to reflect Miss Suhre’s allocation of fault. Miss Wilt, the School Board, and Pelican State must pay the cost of this appeal.
MODIFIED AND, AS MODIFIED, AFFIRMED AND RENDERED.