542 So.2d 1081 (1989)
Giovanni LEVI
v.
SOUTHWEST LOUISIANA ELECTRIC MEMBERSHIP COOPERATIVE (SLEMCO) and Federal Rural Electric Insurance Corporation.
No. 88-C-1426.
Supreme Court of Louisiana.
May 1, 1989.
Rehearing Dismissed May 26, 1989.
*1082 J.J. McKernan, McKernan & Associates, DeVan D. Daggett, Baton Rouge, Joseph Bailey, Logansport, Charles L. Hardy, III, Antoon & Dalrymple, Alexandria, for applicant.
Robert R. McBride, McBride, Foret, Rozas and Leonard, Lafayette, for respondents.
DENNIS, Justice.
The issue here is whether a power company's conduct in operating an uninsulated 14,400 volt electric distribution line 40.5 feet from an oil well and suspended 25.7 feet over the well's only access road or driveway together with the power company's knowledge that oil field workers regularly serviced the well with a mast or boom erectable to a height of 34 feet affixed to a 19 foot long truck, constituted negligence because there was an unreasonable risk that a worker might be electrocuted due to accidental contact or near contact between the mobile mast and the uninsulated high power line. After a jury trial, the jury found that the power company had exercised reasonable care, and the trial court rendered judgment for the defendants. The court of appeal affirmed. 524 So.2d 899 (La.App. 3rd Cir.1988). This court granted a writ. 532 So.2d 106. After entertaining the parties' oral and written arguments, we reverse and remand the case to the court of appeal for the completion of its review of the merits of the controversy in accordance with this opinion.

FACTS
The plaintiff, Giovanni Levi, an oil field roustabout-pumper for Amoco Oil Company, sustained near fatal permanently disabling injuries when the erected mast of a paraffin removal truck rig upon which he was working came in contact or close proximity with an uninsulated 14,400 volt electric distribution line being operated by Southwest Louisiana Electric Membership Cooperative (Slemco). The accident occurred on February 16, 1982 at the E.C. Stuart # 2 Well in the Section 28 Dome Field, in St. Martin Parish, an oil field owned by Amoco Oil Company. In the 1960's Slemco had constructed an uninsulated electrical distribution line to serve most of the 22 wells producing in the field. The power company routed the line so as to avoid crossing a well driveway or coming in close proximity to the well by placing the line either across the main road from the well or behind the well, with the exception of the E.C. Stuart # 2 Well where the line *1083 crossed the access road leading to the well 40.5 feet from the well head and 25.7 feet overhead. Slemco failed to avoid a driveway traversal or a close encounter between its line and the E.C. Stuart # 2 Well because that well was omitted from the power company's original construction plan due to oversight or to the fact that no electricity was supplied to this well or both.
To remove paraffin from its wells the oil company used a rig mounted on a truck. A mast was attached to the rear of the truck with hinges. In the collapsed position, the other end was carried in a "headache rack" over the front of the truck. We infer that, to service a well, the truck was backed to within about 13.5 feet of the well, where the mast was raised and extended so as to describe a 60° angle with the ground placing the mast tip about 30.3 feet high over the well crown.[1] In the raised position the rig was stabilized by guy wires and used to lower a device known as a "lubricator" onto the crown of the well in order to service the well.
On the day of the accident Levi and another Amoco employee, while servicing wells in the field, found it necessary to dismantle the lubricator to make a repair. After borrowing some tools they looked for a dry place to work on the device. They did not intend to service the E.C. Stuart # 2 Well that day but in order to get off the main road and find a dry place to repair the rig they drove the truck into that well site and parked. The truck was headed toward the well with its front end approximately 3-4 feet from the well and its rear end approximately 15-16 feet from the point at which the high power line crossed the access road. It was necessary for the workers to raise the mast off the truck and lower the lubricator to the ground to make the repairs. Using control levers on the side of the truck, Levi raised the mast tip up, over the truck and back toward the power line. Levi had noticed the distribution line at this location on previous occasions but failed to pay attention to it on the day of the accident. Levi recalled only that he last saw the mast when it was at a 45° angle in front of the truck. Shortly thereafter, the mast either touched the power line or came close enough for electrical arcing to occur. 14,400 volts of electricity escaped from the power line and coursed through the mast, the truck and Levi's body.
As a result of the accident, Levi suffered the amputation of both legs just below the knees and severe burns over 25% of his body. At the time of the trial, he had been hospitalized 10 times for 11 different surgical procedures.
Levi filed suit against Slemco and its insurer. The case was tried before a jury. In response to written interrogatories, the jury found that Slemco's conduct did not fall below the reasonable standard of care. The trial court denied plaintiff's motions for a judgment notwithstanding the verdict and for a new trial. Levi appealed, and the court of appeal affirmed. This court granted writs to determine whether the principles of law had been applied correctly below concerning the power company's duty of "utmost care" and the test for "unreasonable risk of harm".

Statement and Application of Legal Precepts
The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so, (b) whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decisive under either a duty-risk or a traditional negligence approach. See D. Robertson, W. Powers, Jr., D. Anderson, Cases and Materials on Torts p. 160-196 (1989); W. Malone, Essays on Torts pp. 325-351 (1986); Prosser and Keeton on Torts § 28 et. seq. (5th ed. 1984); T. McNamara, Ruminations on Tort Law: A Symposium in Honor of Wex Malone: The Duties and Risks of *1084 the Duty Risk Analysis. 44 La.L.Rev. 1227 (1984); L. Green, Judge And Jury pp. 1-244 (1930); H. Alston Johnson, Louisiana Jury Instruction pp. 3-14 (1980); D. Robertson, Reason Versus Rule In Louisiana Tort Law: Dialogues On Hill v. Lundin and Associates, Inc., 34 La.L.Rev. 1 (1973); H. Alston Johnson, Comparative Negligence and the Duty Risk Analysis, 40 La.L. Rev. 319, 327 (1980). Compare Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La.1988) with Hill v. Lundin, 260 La. 542, 256 So.2d 620 (1972). The legal duty under one approach and the standard of conduct under the other impose the same obligation, viz., when the power company realizes or should realize that the transmission of electricity through its line presents an unreasonable risk of causing physical harm to another, it is under a duty to exercise reasonable care to prevent the risk from taking effect. It is undisputed that the escape of electricity from the power company's line was a cause in fact of the plaintiff's injuries. If the risk which took effect as plaintiff's injuries was an unreasonable one, and the power company failed to comply with a duty or standard of care requiring it to take precautions against that danger, the risk was within the scope of the defendant's duty and defendant's substandard conduct was a legal cause of the injuries.

(a) Whether the power company was required to recognize the hazard
A power company is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. See Restatement (Second) of Torts § 289(a) & (b) comment m and illus. 9-14 (1965); cf. Madere v. So. Pac. Transp. Co., 383 So.2d 456 (La.App. 4th Cir.1980); Shively v. Pickens, 346 So. 2d 1314 (La.App. 3rd Cir.1977); see also, Harper, James and Gray, The Law of Torts § 16.5 (1986). If the company has in fact more than a minimum of these qualities, it is required to exercise the superior qualities that it has in a manner reasonable under the circumstances. See Restatement (Second) of Torts, supra, § 289(b). The standard becomes, in other words, that of a reasonable person with such superior attributes. Id. Comment m.
It is well recognized that those who engage in certain activities or come into certain relationships with people or things are under a peculiar obligation to acquire knowledge and experience about that activity, person or thing. See generally, Harper, James and Gray, supra, § 16.5. A carrier owes to its passengers the duty of discovering all detectable defects. Johnson v. Continental Southern Lines, Inc., 113 So.2d 114 (La.App. 2d Cir.1959); Smith v. New Orleans Public Serv., Inc., 391 So.2d 962 (La.App. 4th Cir.1980). Manufacturers must learn of dangers that lurk in their products. La.C.C.Code art. 2476; Philippe v. Browning Arms Company, 395 So.2d 310 (La.1980); Rey v. Cuccia, 298 So.2d 840 (La.1974); Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971); Horne v. Liberty Furniture Co., 452 So.2d 204 (La.App. 5 Cir.1984); Holden v. Clearview Dodge Sales, Inc., 416 So.2d 335 (La.App. 4th Cir. 1982); Schneider v. Eli Lilly and Co., 556 F.Supp. 809 (1983); Restatement (Second) of Torts, supra, § 395, comments. Traditionally, professionals as well as manufacturers must keep reasonably abreast of current advances in their fields. See Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986); see Harper, James and Gray, supra, § 16.5.
By the same token, a company which maintains and employs high power lines is required to exercise the utmost care to reduce hazards to life as far as practicable. Hebert v. Gulf States Utilities, supra; Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265 (La.1980). Pursuant to this duty, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Spillars v. Louisiana Power and Light Co., 49 So.2d 474 (La.App. 2d Cir.1950); Scott v. Claiborne Elec. Co-op. 13 So.2d 524 (La.App. 2d Cir. 1943). Consequently, a company will be considered to have constructive knowledge *1085 of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties. Potts v. Shreveport Belt Ry. Co., 110 La. 1, 34 So. 103 (1903); Bourgoyne v. Louisiana Public Utilities Co., 150 So. 68 (La.App. 1st Cir.1933); Carlock v. Westchester Lighting Co., 268 N.Y. 345, 197 N.E. 306 (1935); Roberts v. Pacific Gas & Elec. Co., 102 Cal.App. 422, 283 P. 353 (1929).
In the present case there is no dispute as to the fact that the power company had actual knowledge of the oil company's regular use of trucks with erectable high masts around its wells. Because this activity had continued on a regular basis over a long period of time the power company should have been aware of the physical characteristics of this equipment and any electrical hazard it might create. An Amoco employee testified that although the E.C. Stuart # 2 Well was not a "problem paraffin well", the paraffin was removed from it every two to three weeks. Levi testified that other wells in the field were serviced as frequently as every week. The truck involved in the accident was designed to cut paraffin accumulating in the wells. The truck itself measured 19 feet in length. The mast attached to the rear of the truck with hinges, 7.4 feet above ground level, was 26.5 feet long. Thus, when raised to its full height the mast extended approximately 34 feet above ground level. Since the power company knew that its uninsulated 14,400 volt electric line passed near the oil wells at a level of only 25 to 26 feet above ground, the company should have known that electrical hazards would be created if masts were raised near the line.
The evidence clearly indicates that the power company was aware of these potential dangers and took significant precautions against them in choosing the route of its line. The 22 oil wells in the oil field had been completed when the power company constructed its transmission line. The company purposefully routed the line, in most instances, so as to give wide berth to each well and to avoid crossing over well access roads. Except for the E.C. Stuart # 2 Well, according to the exhibits, the power line was kept at distances of 76.5 to 212 feet from the wells. At one site other than the Stuart Well the line partially encroached upon the well access road, but the line there was placed approximately 150 feet away from the well. Thus, the design of the power line route, except at the Stuart Well, afforded workers with high-masted equipment ample working area free of electrical hazards, and, at all wells except Stuart and one other, completely safe access, as margins of error against their negligence or inattentiveness.
At the E.C. Stuart # 2 well site, however, the power company placed its line completely across the access road only 40.5 feet from the well and only 25.7 feet above ground. The evidence indicates that the power company designed the route of its distribution line to avoid such risks at every other well site but failed to do so at the E.C. Stuart # 2 Well because of an error in its original construction plans. Many of the power company employees observed roustabouts working with high masted equipment around wells in the oil field on a regular basis for many years. A routine visual inspection would have given the power company notice that careless or inattentive operation of the high masted equipment could cause an electrical accident. Thus, the company definitely had actual or constructive knowledge that oil field activity involving equipment capable of extending vertically some 34 feet and horizontally some 45 feet was occurring regularly at the E.C. Stuart # 2 Well. Further, the company knew that the route of its line allowed only 40.5 feet between the well and the point at which its 25.7 foot high uninsulated wire crossed over the access road within which to conduct these operations.
We do not think reasonable minds can disagree with the conclusion that the power company, particularly with its superior knowledge, skill and experience in electrical safety, should have recognized that its conduct under these circumstances involved a risk of harm to oil field workers. Aside from the obvious serious possibility that an inattentive worker might raise the mast while parked on the access road too *1086 near the power line, there were similar chances that a falling mast could pass dangerously close to the line or that a careless roustabout might attempt to drive under the line on his way to another well without fully lowering his mast. The power company complains that it should not be charged with recognition of any risk that takes effect through a victim's negligence. But the ordinary reasonable person, and even more so the power company, is required to realize that there will be a certain amount of negligence in the world. When the risk becomes serious, either because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against "that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated." Murphy v. Great Northern R. Co., 2 Ir.Rep. 301 (1897); See Prosser and Keeton on Torts, supra, § 33 at p. 198; Restatement (Second) Torts, supra, § 302A. It is not due care to depend on the exercise of care by another when such reliance is accompanied by obvious danger. See Putt v. Daussat, 381 So. 2d 955 (La.App. 4th Cir.1980); Dragotis v. Kennedy, 190 Minn. 128, 250 N.W. 804 (1933); Prosser and Keeton, Id.
Moreover, the power company had actual knowledge of previous instances of oil field workers' negligence or inattentiveness in moving erect masts under or near the uninsulated power lines. Its own employee testified that he had warned other roustabout crews of danger on two previous occasions when they drove under the uninsulated electric line on a board road with their masts partially or fully erect.

(b) Whether the hazard was an unreasonable risk of harm
The test for determining whether a risk apparent to one in the position of the actor is unreasonable is supplied by the following formula: The amount of precautions "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice to avoid the risk." L. Hand, J., in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir.1940); Allien v. Louisiana Power & Light Co., 202 So.2d 704 (La.App. 3rd Cir.1967); Goff v. Carlino, 181 So.2d 426 (La.App. 3rd Cir.1965); Posner, A Theory of Negligence, 1 J. Legal Stud. 29 (1972); Calabresi and Hirschoff, Toward a Test For Strict Liability in Torts, 81 Yale L.Rev. 1055 (1972); Harper, James and Gray, supra, § 16.9; Restatement (Second) of Torts, supra, § 291.
The amount of caution tends to increase with the first factorthe likelihood that the actor's conduct will injure others. Compare Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983) with Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). See Terry, Negligence 29 Harv. L.Rev. 40 (1915); Restatement (Second) of Torts, supra, §§ 291-295. Other things being equal, the amount of care required will vary directly with the degree of likelihood of injury. Harper, James and Gray, supra, § 16.9.
The amount of caution required also tends to increase with the second factorthe seriousness of the injury if it happens. If the harm that may be foreseen is great, conduct that threatens it may be negligent even though the statistical possibility of its happening is very slight. Harper, James and Gray, supra, § 16.9; See Culpepper v. Leonard Truck Lines, 208 La. 1084, 24 So.2d 148 (1945) (backing truck in dangerous place); Irelan-Yuba Gold Quartz Min. Co. v. Pacific Gas & Elec. Co., 18 Cal.2d 557, 116 P.2d 611 (1941) (high tension wires); Sullivan v. Mountain States Power Co., 139 Or. 282, 9 P.2d 1038 (1932) (electricity).
The third variable factorthe interest the defendant must sacrifice or the burden he must assume in order to avoid the riskworks in the opposite direction and may sometimes be entitled to enough weight to prevent conduct from being negligent even where it involves virtual certainty of very great harm. The interest that must be sacrificed or the burden that must be assumed to avoid the risk is balanced against the danger. At this point *1087 there is the greatest need for careful analysis so as to focus attention on the precise interest that would be sacrificed, or the precise burden that would be assumed, and this in turn will depend on precisely what act or omission is challenged as negligent. The interest whose sacrifice is in question on the issue of negligence is the value of the particular act or omission that is challenged as negligent. Looked at another way, it is the burden of refraining from the particular act or of taking an effective precaution to cover that particular omission. It is not the value of the activity or enterprise as a whole, or the detriment that would flow from its abandonment. Harper, James and Gray, supra, § 16.9; Prosser and Keeton on Torts, supra, § 31; Restatement (Second) of Torts, supra, § 291, comment e; Id. § 292, comment a. Thus, the cost of precautions to avoid a recognizable risk is relevant, but the law imposes liability for failure to take precautions, even against remote risks, if the costs of the precautions would be relatively low. Allien v. Louisiana Power & Light Co., supra; See Malone, Work of The Appellate Courts, 29 La.L.Rev. 212, 213 (1969); Crawford, Work of Appellate Courts, 40 La.L. Rev. 564, 568 (1980); Harper, James and Gray, supra, § 16.9.
The facts of the present controversy and other similar power line cases invite a sharp focus upon the essential balancing process that lies at the heart of negligence. See Malone, Work of Appellate Courts, 29 La.L.Rev. 212 (1969) (commenting on Allien v. Louisiana Power & Light Co., 202 So.2d 704 (La.App. 3rd Cir.1967)). In such a case, a paraphrase of the Hand formula helps to bring the elements of the process into relief: Since there are occasions when high voltage electricity will escape from an uninsulated transmission line, and since, if it does, it becomes a menace to those about the point of its escape, the power company's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) the possibility that the electricity will escape; (2) the gravity of the resulting injury, if it does; (3) the burden of taking adequate precautions that would avert the mishap. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the failure to take those precautions is negligence.[2]
The cost of prevention is what Hand meant by the burden of taking precautions against the accident. It may be the cost of installing safety equipment or otherwise making the activity safer, or the benefit foregone by curtailing or eliminating the activity. See Posner, A Theory of Negligence, 1 J. Legal Stud. 29, 32 (1972). No one, including Judge Hand thought reasonable care can be measured with mathematical precision, however. His formula in Carroll Towing merely suggests the kind of evidence that is relevant on the issue of reasonable care and how it should be weighed. See D. Robertson, W. Powers, Jr. & D. Anderson, Cases and Materials on Torts, supra, p. 85; Harper, James and Gray, supra, § 16.9; See also, Entrevia v. Hood, 427 So.2d 1146 (La.1983); Geny, Method of Interpretation and Sources of Private Positive Law (Louisiana State Law Institute trans. 2d ed. 1963); Cardozo, The Nature of the Judicial Process (1921); Fleming, Is There A Future For Tort? 44 La.L.Rev. 1193, 1200 (1984).
Applied to the situation in the present case, the likelihood that a roustabout's inattentiveness or that a malfunction of a rig would allow a mast to come close enough to the uninsulated power line to cause the electricity to escape varied between locations in the oil field. This *1088 danger was greatest on the E.C. Stuart # 2 well site at which the accident happened. This was the only location at which the power company suspended its uninsulated line completely across a road used by masted truck operators for access to a well. It was the one site where the uninsulated line was located only about two truck lengths from the well, leaving very little room for a high masted truck to maneuver safely. The fact that the power company systematically avoided these hazards elsewhere within the oil field possibly tended to make workers less wary of them at the accident site and thereby increased the likelihood of an accident. Under these circumstances, there was a significant chance that the power company's conduct would cause harm or death to one or more of the class of workers handling masted equipment at the well site. See Restatement (Second) of Torts, supra, § 293(b).
The social value which the law attaches to each person's interest in life and freedom from physical harm is of the highest order. Fatal or disastrous harm is likely to be caused to these interests by a high voltage electrical accident. Moreover, electrical hazards located in oil fields or other industrial settings typically threaten harm to many workers when the risk takes effect. See Restatement (Second) Torts, supra, § 293. Consequently, the gravity of the harm, if the risk takes effect, is extreme.
Plaintiff's experts testified that several different kinds of precautions could and should have been taken to eliminate or reduce the hazard caused by the operation of the bare high voltage line at the E.C. Stuart # 2 Well: (1) The power company could have routed the line differently so as to avoid creating a hazardous driveway crossing and a dangerously small workspace abutting the hot high voltage wires; (2) The company simply could have raised the line to a safer level at the site of the accident; (3) The utility could have replaced the line at the well with factory installed insulation or could have insulated the line temporarily with rubber hose type insulation; (4) The company could have attached one of various forms of warnings, i.e., signs on poles, stakes or on the line itself; or orange balls on the wires; (5) The power utility could have installed the line underground instead of overhead at the accident site. With the possible exception of underground installation, these experts indicated that the burden of these precautions were inexpensive and did not outweigh the magnitude of the risk.
The defendants do not argue that the cost of taking these precautions would have exceeded the hazard of an electrical accident. Instead they contend that none of the preventative measures would have been effective or practical.
The defendants' expert attempted to show that rerouting the power line would not result in any net gain in safety for oil field workers. He testified that placing the line on the other side of the main road from the Stuart Well, so as to avoid its access road and work area, would require either a "dog-legged" route or a traversal of the driveway at a different well site. He argued that the angles and guy-wires required in a "dog-legged" pattern created the danger of a weak and sagging line. From our review of the expert testimony and the plats of the well sites, however, we conclude that the power company could have eliminated the dangerous situation at the Stuart Well without creating any danger elsewhere. The utility avoided well access roads and other hazards consistently throughout the oil field by using right angles and zig-zags in selecting the course of the power line. There is no concrete evidence that this policy caused any danger from weak or sagging lines. Furthermore, a driveway traversal on the other side of the main road from the Stuart Well clearly would have been much less dangerous, because the well site on the other side of the road was considerably further back from the main road.
The defendants' expert only quibbled at the precaution of insulation. His objection to insulation was that it would deteriorate and might give workers a false sense of security. His criticism must be discounted as being directed evidently at rubber hose type temporary insulation, rather than factory *1089 installed permanent insulation. The record discloses no reason why permanent insulation could not have been used at the accident site. Even if only temporary insulation were available, we are convinced from the evidence that this lesser precaution would reduce the risk substantially and be worth the burden it cost. As for the company's evidence that insulation of the line would have to be replaced from time to time, it is clear that this small additional cost would not cause the burden of precautions to outweigh the gravity of the harm threatened when multiplied by the likelihood that it would happen.
As for the precaution of a warning, the defendants' expert objected to a warning attached to the power line poles because, he contended, it would present danger to workers climbing the poles. He apparently had no criticism of other types of warnings as presenting any danger to electrical workers.
The power company argues generally, however, that no warning would have been effective as to Levi because he knew of the existence of the uninsulated line and nevertheless encountered the danger. The purpose of a duty or standard of care requiring a warning, however, is to attract and arrest the attention of a potential victim. It assumes both the possibility and probability of his inattention. Although such a legal obligation is not imposed to protect the utterly indifferent or foolhardy, at the same time, however, its protection is not restricted to those whose senses are precisely attuned to the prospect of the particular warning called for. Hailey v. Texas & P. Ry., 113 La. 533, 37 So. 131 (1904); cf. Bloxom v. Bloxom, 512 So.2d 839 (La. 1987); See Malone, Cause In Fact, 9 Standford L.Rev. 60, 74 (1956). The evidence does not indicate that Levi would have been oblivious to a warning sign or an orange ball warning on the power line at the E.C. Stuart well site. On the contrary, there is every reason to believe that if such a warning had been posted, because of the absence of warnings at other well sites (due to lack of necessity for them there), Levi's attention would have been drawn to the warning, causing him to be more attentive to the danger.
The expert witness for the defendants apparently could find no fault with the suggested precautions of elevation of the line to a height safely above the reach of masted equipment or the precaution of underground installations. He was not asked about either safeguard and he did not volunteer any information on them.
When the components of the evidence are brought into relief and weighed in the light of their interrelationships, reasonable minds must agree that the minimal burden of adequate precautions was clearly outweighed by the product of the chance and the gravity of the harm. Accordingly, the power company was guilty of negligence that was a legal cause of plaintiff's injuries, or, in other words, the company breached its duty to take precautions against the risk that took effect as those injuries, and the lower courts committed manifest error in not reaching this conclusion.
For the reasons assigned, the judgment of the court of appeal is reversed, the judgment of the trial court is set aside, and the case is remanded to the court of appeal for it to review the balance of the merits of the controversy and to render a judgment consistently with this court's opinion.
REVERSED AND REMANDED TO THE COURT OF APPEAL.
MARCUS, J., concurs and assigns reasons.
LEMMON, J., dissents and assigns reasons.
COLE, J., dissents for reasons assigned by LEMMON, J.
MARCUS, Justice (concurring).
I agree that the power company breached its high duty of care to plaintiff under the circumstances, and the risk of plaintiff's accident was within the scope of the duty owed. Accordingly, I concur in the finding that the power company was guilty of negligence. In my view, when the case is remanded to the court of appeal, it should consider plaintiff's negligence, if *1090 any, under the principles of comparative negligence.
LEMMON, Justice, dissenting.
It is highly unusual for this court to decide only one portion of a liability issue. Nevertheless, causation is usually the threshold issue in a liability decision, and I would decide the case on the basis of causation.
During a parafin cutting operation at Stewart # 2 well, an A-frame truck backs up adjacent to the well site and lifts the boom over the truck and over the well in order to perform the operations in the hole. In this operation the boom comes no closer than ten feet to the power lines.
At the time of this accident plaintiff was not performing a parafin cutting operation. He had had difficulty with his crane and was returning to the shop to obtain wrenches needed to perform the repairs. En route to the shop he came upon a contract crew near the Stewart # 2 well site and borrowed the wrenches. Because the area was muddy from recent rains and because the well site in question was the closest high and dry spot in the area, plaintiff drove his truck off the main road onto the shelled area of the well site and stopped several feet from the well site. In doing so, he drove under the power lines, which were in open view. Because it was necessary to do so in performing the repairs, he lifted the boom of his A-frame truck. During the lifting the boom struck the power lines and injured plaintiff.
Plaintiff's theory of the case, either in negligence or strict liability, was that defendant's placement of the power lines in close proximity to the well site (which was in existence when the power lines were constructed) created an unreasonable risk of harm for which defendant should be held liable (perhaps subject to a reduction in accordance with plaintiff's contributory negligence). That theory is based upon the foreseeable danger of oilfield activities in close proximity to the well site in which a boom or other equipment working on the well may come into contact with the power lines.
The problem with plaintiff's theory is that oilfield activity in servicing this well site had nothing to do with this accident, and therefore any fault in defendant's placement of its lines in proximity to foreseeable oilfield activity near the well site was not a cause in fact of this accident. The well site could have been located 200 feet from the power line, and the accident would have occurred exactly as it did when plaintiff pulled off the main road into the spot he chose to perform his repair. Any duty on defendant to place its power lines a reasonable distance from the well site did not extend to a plaintiff who pulled off the main road to perform a job chore that had nothing to do with the well site and could have been performed at any dry location on the entire field.[1] There is simply no ease of relationship between defendant's duty to contruct power lines a reasonable distance away from well sites in the oilfield and the risk which gave rise to this particular injury.
NOTES
[1] These distances are not contained in the evidence but are derived from a schematic of the truck in the well-servicing position with its mast extended upwards behind the truck at an angle of 60°. For a photographic reproduction of the truck and rig see the dissenting opinion of Judge Knoll in the court of appeal. Levi v. Slemco, 524 So.2d 899, 907 (La.App.3rd Cir. 1988).
[2] "Since there are occasions when every vessel will break from her moorings, and since, if she does, she becomes a menace to those about her; the owner's duty, as in other situations, to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions. Possibly it serves to bring this notion into relief to state it in algebraic terms: if the probability be called P; the injury L; and the burden B; liability depends upon whether B is less than L multiplied by P: i.e., whether B ≤ PL." United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947).
[1] Plaintiff could have stopped on the roadway, on a shell driveway across the roadway from this particular site, or at any of the numerous other places where there was a shelled area. Because the power lines crossed the main road at least six times, there were at least six points on the main road that posed this exact hazard to an inattentive worker who stopped his truck to repair the crane.