552 So.2d 746 (1989)
Herman LAJAUNIE, Jr.
v.
CENTRAL LOUISIANA ELECTRIC COMPANY, INC. and Highlands Insurance Company.
No. 88 CA 1532.
Court of Appeal of Louisiana, First Circuit.
November 14, 1989.
*747 Joseph R. Streva, Jr., Morgan City, for plaintiff.
James B. Supple and David Rabalais, Bauer, Darnall & Boudreaux, Franklin, for intervenor, U.S.F. & G.
Richard D. Chappuis, Jr., Voorhies & Labee, Lafayette, for defendants.
Before LOTTINGER, CRAIN and LeBLANC, JJ.
CRAIN, Judge.
On August 23, 1984, while employed by Francis Drilling Fluids, Inc. (Francis), Herman Lajaunie, Jr., was assigned the task of assisting a co-worker in removing scrap metal from one section of Francis' property to another. A crane was being used in moving the metal. Lajaunie's task was to assist the crane operator by attaching the scrap metal to the bridle of the crane. As Lajaunie reached down to fasten a piece of scrap metal, the boom made contact with an overhead bare electric distribution line resulting in Lajaunie's electrocution. Lajaunie suffered severe electrical burns which required numerous surgeries including the amputation of three toes and a part of the foot and several skin grafts. Lajaunie received worker's compensation benefits from his employer and was still employed by Francis at the time of trial.
Mr. and Mrs. Lajaunie instituted this action for damages against Central Louisiana Electric Company, Inc. (Cleco), the owner of the power lines, and its insurer, Highlands Insurance Company (Highlands). After trial on the merits judgment was rendered in favor of plaintiffs and against defendants. From this judgment defendants appeal alleging as error the trial court's assessment of 25% fault on the part of Cleco and the trial court's award to Lajaunie for loss of earning capacity.

LIABILITY OF CLECO
The judgment was silent regarding apportioning fault between defendants Cleco and Highlands and Francis, which was not a party to this suit. However, in written reasons for judgment the trial court found that Francis was primarily responsible for the accident through the fault of its employee who was operating the crane. The court further found that the fault of Francis was not the sole cause of the injury; Cleco was also at fault. Twenty-five percent fault was assessed against Cleco due to its misplacement of the power line, its failure to warn, and its failure to insulate the power line. No fault was attributable to Lajaunie.
The liability of Cleco must be assessed under a duty risk analysis. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). The transmission of electricity and its escape through bare lines is a cause of the accident. When a utility company recognizes that its conduct under certain circumstances creates an unreasonable risk of harm to another it has the duty to take reasonable precautions to prevent the risk of the harm occurring. Levi v. Southwest Louisiana Electric Member Cooperative, (SLEMCO), 542 So.2d 1081 (La.1989). A power company is in a superior position to have acquired peculiar knowledge and experience regarding the transmission of electricity and the dangers associated with its transmission. Thus, when a reasonable person of superior attributes would recognize that its conduct creates a risk of harm to another, a power company in a similar position is required to recognize the risk. Id. at 1084.
*748 The Francis plant is located in an industrial zone near the town of Berwick. The property is located between the levee and the Atchafalaya River. Francis is an oilfield related industry. Its facilities at the Berwick site include docking facilities and large containers for the storage of drilling mud which is transfered to and from the plant. The plant was constructed along the river side of the property. The section of property on which the scrap metal was stored was on the levee side of the property, which was low and occasionally under water. It was undeveloped, other than for a shell driveway or private road which ran from the levee through the property to the plant. The overhead power lines were forty feet high and cut diagonally across the property, running directly above the section of the shell driveway on which the crane was situated at the time of the accident and the area where the scrap metal was stored.
The crane was owned by Francis and was used periodically at several of its different facilities throughout the south. It was being temporarily used at the Berwick plant during and immediately after construction of the plant. At the time of the accident the tracks of the crane were located on the driveway. The boom was forty feet long.
Although the accident occurred away from the mud storage tanks and docking facilities, the entire property was subject to industrial activity: vehicles traversed the driveway or shell road; the scrap metal had been stored in that area since construction of the plant had commenced; and some scrap metal had been previously removed from the storage area. Under these circumstances we find that Cleco should have recognized that certain industrial activities involving the use of industrial machinery would take place in the vicinity of the diagonally placed overhead bare distribution lines. One of the hazards posed is that the machinery would come in contact with the bare distribution line resulting in injury to an employee.
Cleco contends that the installation of the bare distribution line did not create an unreasonable risk of harm in that Cleco had complied with the standards of the National Electric Safety Code (NESC) by insulating the lines by isolation (i.e., by locating the lines where they are not readily accessible to people).
A known risk is unreasonable when the likelihood of injury resulting from the conduct and the gravity of the possible resulting injury outweigh the interest sacrificed to avoid the risk. Levi, 542 So.2d at 1086. Although there may be a slight statistical probability of the harm occurring, the amount of precautions which must be taken are increased by the gravity of the possible harm. Id.
Construction of the Francis plant was completed and it became operational in May, 1984. Prior to construction, Francis contacted Cleco regarding the furnishing of electric power to the plant. The plant and docking facilities were located along the river. The original plans called for the overhead placement of the power lines perpendicular to the levee along the southern property line or fence up to the mud storage area. From that point to the plant, storage, and docking areas the plans called for underground distribution lines. Rather than being installed perpendicular to the levee along the southern property line as planned, the overhead lines were actually installed diagonally across the property from the levee to the area where the distribution lines were placed underground. This resulted in the overhead lines running directly over the scrap metal storage area and over a section of the adjacent shell road.
Ronald James Albarado, employed by Cleco as an electrical engineer, stated that the primary reason the overhead lines had not been installed along the southern boundary as originally planned was because that route required the installation of a utility pole in a "boggy" area of the Francis property. This would have resulted in increased installation and maintenance costs to Cleco. In response to a query on cross examination regarding the placement of distribution lines Albarado responded that such lines are more commonly installed adjacent to property lines, or *749 fence lines, not diagonally across the property.
Robert E. Briggs, accepted by the court as an expert in electrical engineering, testified on behalf of plaintiff. He stated that the technology is available to install and maintain utility poles and lines in swampy or boggy areas as are commonly found in south Louisiana. In his opinion the overhead distribution lines should have been placed adjacent to the southern property line as originally planned. If installed diagonally, the bare overhead lines should have been insulated by aerial cable (conductors covered together by an outer metal jacket) or by factory insulation. Another alternative would have been to install the lines underground within metal conduits which would then be encased in concrete.
Frederick Michael Brooks, accepted as an expert in electrical engineering regarding the design of electric utility distribution systems, testified on behalf of defendant. In his opinion, in swampy or boggy areas the preferred method of installation is overhead rather than underground because of the increased expense and labor required for underground installation. He also stated that the use of factory insulated lines is not recommended because it is subject to deterioration caused by high voltage and exposure to the elements. In response to a question by plaintiff's counsel regarding the use of factory insulated lines, Brooks responded that had the crane come into contact with recently installed factory insulated lines, plaintiff would have been protected and the injury would not have occurred.
Although the financial cost of taking precautions to avoid a known risk is relevant, if the cost of taking those precautions is relatively low the utility company's failure to act is a breach of its duty to exercise reasonable care to prevent the risk from taking effect. Levi, 542 So. 2d at 1087.
After careful review of the record and after balancing the factors enumerated in Levi, we find under these facts and circumstances that the burden of taking adequate precautions is greatly outweighed by the possibility of the harm occuring and the gravity of the potential resulting injury. Consequently, Cleco's failure to take adequate precautions is a breach of its duty owed to plaintiff and that breach is a legal cause of the accident. Furthermore, we cannot find that the trial court was clearly wrong in its allocation of 25 percent fault to Cleco. See Files v. State, DOTD, 484 So.2d 746 (La.App. 1st Cir.1986).

LOSS OF EARNING CAPACITY
Appellants contend that the trial court's award for loss of future earning capacity is speculative and not supported by the evidence.
Mr. Lajaunie was awarded the sum of $214,883.93 plus interest and costs. In written reasons for judgment the trial court specified that $25,000 of the above total was awarded for loss of earning capacity.
An award for loss of earning capacity encompasses plaintiff's earnings before and after a disabling injury as well as the loss or reduction of his earning potential. Rodgers v. National Dealer Services, Inc., 508 So.2d 1007 (La.App. 2d Cir.), writs denied, 512 So.2d 1183 and 513 So.2d 1211 (La.1987).
Lajaunie was still employed by Francis at the time of trial. One month after returning to work following the accident, Lajaunie was promoted to plant supervisor. He received a $200 per month pay raise in July, 1987. Plaintiff admittedly performed the same duties subsequent to the accident as prior to the accident. However, he stated that it takes him longer to perform the same tasks because he experiences pain with either stair climbing or standing for long periods of time. Consequently, he must rest more often.
Dr. Darrell Henderson, the reconstructive surgeon who performed skin grafts on Lajaunie, testified by deposition that Lajaunie has a 45% permanent partial disability of the left foot. He stated that eventually Lajaunie will be unable to perform the same work in which he was engaged prior *750 to the accident. He will have to perform more sedentary work in the future.
Dr. Walter Homer Daniels, who was accepted by the court as an expert in the fields of family and industrial medicine, has performed approximately 20,000 pre-employment physicals. At the request of Lajaunie's attorney he performed a pre-employment physical on Lajaunie. Given that Lajaunie was assessed a 45% partial permanent disability of the left foot, in Dr. Daniels' opinion, should Lajaunie be required to seek new employment, he could not pass a pre-employment physical. Consequently, he would be unable to obtain employment in an oilfield related industry.
"An award for lost earning capacity is inherently speculative and cannot be calculated with absolute certainty. Thus the court must exercise sound discretion in rendering awards which are consistent with the record and which do not work an injustice on either party." Peterson v. Western World Insurance Co., 536 So.2d 639, 646 (La.App. 1st Cir.1988), writ denied, 541 So.2d 858 (La.1989).
Under these facts and circumstances we find the award of $25,000 for loss of earning capacity is not an "abuse of discretion. Accordingly, the judgment of the trial court is affirmed. Costs are assessed against defendants.
AFFIRMED.
LOTTINGER, J., dissents and assigns written reasons.
LOTTINGER, Judge, dissenting.
Levi v. Southwest Louisiana Electric Membership Cooperative (SLEMCO), 542 So.2d 1081, 1084 (La.1989), holds that the legal duty and standard of conduct applicable to electric power companies is,
"when the power company realizes or should realize that the transmission of electricity through its line presents an unreasonable risk of causing physical harm to another, it is under a duty to exercise reasonable care to prevent the risk from taking effect."
However, the facts in the instant case are far different from those in Levi. Here, at the point where the power lines crossed the shell driveway, no industrial activity was scheduled to take place. The storage of scrap iron near the driveway, and its ultimate removal, was an isolated activity which took place during the construction phase and was not to be followed on a regular basis. Thus, the crossing of the power lines forty feet above the driveway did not create an unreasonable risk of causing physical harm to another.
Therefore, I respectfully dissent from the affirmance of the finding of fault on the part of SLEMCO.