590 So.2d 786 (1991)
Brenetta Green WILLIAMS, Individually and as Natural Tutrix of the Minor Ronald Dumas, Jr., et al.
v.
LOUISIANA POWER & LIGHT COMPANY, et al.
Tabby Dash WILLIAMS, et al.
v.
LOUISIANA POWER & LIGHT COMPANY, et al.
Nos. 91-CA-376, 91-CA-377.
Court of Appeal of Louisiana, Fifth Circuit.
November 13, 1991.
*787 Edmond R. Eberle, New Orleans, for plaintiff-appellant.
Eugene G. Taggert, W. Glenn Burns, Andrew P. Carter, Robert E. Rougelot, New Orleans, for defendant-appellee.
Andrew A. Lemeshewsky, Jr., New Orleans, for intervenor-appellant.
Before BOWES and DUFRESNE, JJ., and FINK, J., Pro Tem.
DUFRESNE, Judge.
This is an appeal from two jury verdicts, in consolidated cases, exonerating an electric power company from fault in an accident in which plaintiffs suffered severe injuries when an aluminum ladder being used by them came into contact with a bare eight-thousand volt power line. Because we find no manifest error in the determinations of the jury, we affirm.
The general background and circumstances of the incident are not seriously disputed. The site of the accident was next to Building No. 12 of the Shadowlake Apartments complex in Jefferson Parish. Prior to construction of this complex on a previously vacant tract, Louisiana Power and Light Co. had acquired a ten-foot right-of-way on the edge of the tract and had run on poles three bare service wires within this servitude in a vertical configuration. The lowest of these wires was about 29 feet above the ground, the next, 33 feet and the highest, 37 feet.
In mid-1980, the Shadowlake group contracted with Live Oak Builders, a construction firm, to build the complex. During the course of the project, various architects, engineers, electrical contractors, LP & L and the Parish of Jefferson were involved in one way or another with the work.
The plaintiffs in this matter are Tabby Dash Williams, his wife, Brenetta Green Williams, and Ronald Dumas, Jr., the son of Mrs. Williams by a prior marriage, who was sixteen years old at the time of the accident of December 16, 1986. During the preceding few months, the entire project was coming to an end, and Building No. 12 was likewise substantially complete. Tabby Williams had been working as a painter for Live Oak until a few weeks before the incident. Because of the work slow-down, he went to work for Able Janitorial Services, which had a contract for interior cleanup of the various units. Brenetta Williams was also an employee of Able, and her son Ronald, although not on Able's payroll, came to work with his mother to help her, and she in turn paid him from her own wages. This arrangement was known by Able's manager.
On the day in question, Tabby Williams was engaged in cleaning the outside of a third story dormer window on Building No. 12. Upon arriving at work Williams got Ronald to assist him in putting up against the building, directly under the dormer window, an aluminum ladder provided by Live Oak. When set up and extended, the top of the ladder was at about 32 feet. Ronald then went back indoors to assist his mother. Later that morning Williams again got Ronald to help him handle the ladder, ostensibly *788 to take it down, and in the course of this activity plaintiffs lost control of it and it fell against the lower power line. Both suffered extensive electrical burns as a result.
Plaintiffs filed suits for their injuries and eventually named some thirteen parties defendant, including LP & L, Live Oak Builders, Able Janitorial Services, the Parish of Jefferson, and the architects, engineers, and various other firms which had done work on the project. The thrust of these suits was that Building No. 12 had been constructed too close to the existing wires, and that this situation created a hazardous condition at the site which should not have been permitted to exist, and once it did exist, should have been recognized and corrected by the responsible parties.
By the beginning of trial, the plaintiffs had resolved their claims against all defendants except LP & L. After a lengthy trial of both suits before the same jury, verdicts were rendered in which LP & L was found free of fault, Live Oak Builders and Able Janitorial Services were each found 5% at fault, and Tabby Dash Williams was found 90% at fault for the accident. As per the jury interrogatories, the jury further fixed damages for the injuries suffered by the plaintiffs. Plaintiffs now appeal, and urge six assignments of error.
We first address plaintiffs' assertion that the trial judge improperly instructed the jury as to the applicable law. The pertinent instructions were taken verbatim from the two leading cases on electrical accidents, i.e. Dobson v. Louisiana Power and Light Co., 567 So.2d 569 (La. 1990), and Levi v. SLEMCO, 542 So.2d 1081 (La.1989), as follows:
Since there are occasions when high voltage electricity will escape from an uninsulated transmission line, and since, if it does, it becomes a menace to those about the point of its escape, the power company's duty, as in other similar situations, to provide against resulting injuries is a function of three variables (1) the possibility that the electricity will escape; (2) the gravity of the resulting injury, if it does; (3) the burden of taking adequate precautions that would avert the mishap. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the failure to take those precautions is negligence.
The cost of prevention is what [is] meant by the burden of taking precautions against the accident. It may be the cost of installing safety equipment or otherwise making the activity safer, or the benefit foregone by curtailing or eliminating the activity. Levi, supra, at 1087.
The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so, (b) whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decisive under either a duty risk or a traditional negligence approach. The legal duty under one approach and the standard of conduct under the other impose the same obligation, viz., when the power company realizes or should realize that the transmission of electricity through its line presents an unreasonable risk of causing physical harm to another, it is under a duty to exercise reasonable care to prevent the risk from taking effect. It is undisputed that the escape of electricity from the power company's line was a cause in fact of the plaintiff's injuries. If the risk which took effect as plaintiff's injuries was an unreasonable one, and the power company failed to comply with a duty or standard of care requiring it to take precautions against that danger, the risk was within the scope of the defendant's duty and defendant's substandard conduct was a legal cause of the injuries.
A power company is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other *789 pertinent matters, intelligence and judgment as a reasonable person would have. The standard becomes, in other words, that of a reasonable person with such superior attributes.
It is well recognized that those who engage in certain activities or come into certain relationships with people or things are under a peculiar obligation to acquire knowledge and experience about that activity, person or thing. A carrier owes to its passengers the duty of discovering all detectable defects. Manufacturers must learn of dangers that lurk in their products. Traditionally, professionals as well as manufacturers must keep reasonably abreast of current advances in their fields.
By the same token, a company which maintains and employs high power lines is required to exercise the utmost care to reduce hazards to life as far as practicable. Pursuant to this duty, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties. Levi supra, at 1083-85 (citations omitted).
Any person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. A reasonable person who has an ordinary amount of exposure to the facts of modern life in America should be treated as though he knows that any electrical line could be dangerous. Dobson, supra, at 573 (citations omitted).
The above quotes are, in fact, the law as to electrical accidents and these instructions were therefore a correct and comprehensive statement of that law.
Plaintiffs urge, to the contrary, that under the rule of Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985), no instruction should have been given as to possible negligence on their part. That argument was rejected in Dobson supra, at 574, n. 3, and we see no reason to rule differently here.
In a related area, plaintiffs contend that the jury interrogatory forms were improperly drawn. The forms consisted of four parts. The first asked whether any of the following parties were at fault in the accident and then listed LP & L, Live Oak, Able Janitorial, Shadowlake, Jefferson Parish, four other firms involved in the project, and the two plaintiffs. The second asked that if the jury answered "yes" as to any party listed in question 1, then was that party's fault a cause of the injuries. The third question involved fixing the percentage of fault as to those parties named affirmatively in questions 1 and 2, and the final question concerned the amount of damages.
Plaintiffs first contend that the forms should either not have listed non-parties or should have placed LP & L, the only remaining defendant, in separate questions as to fault and causation. Clearly, the listing of all potentially liable parties was in full accord with La.Code Civ.Pro. art. 1812, and no law or jurisprudence is cited for the proposition that there should have been separate questions as to LP & L, the only real defendant. We therefore reject these arguments.
The next contention in regard to the interrogatories is that they should have contained an instruction to the effect that if the jury absolved LP & L of fault, in questions 1 and 2, it should go no further. While in hindsight, such an instruction would have saved the jury from further deliberation, such deliberation has in no way affected the validity of the verdicts as to LP & L, nor have plaintiffs shown that they have been prejudiced in any way by the action of the jury in completing the forms. We therefore reject this argument as well.
*790 We now turn to plaintiffs' main complaint, which is that the exonerating of LP & L by the jury was manifest error. The most recent discussion of the manifestly erroneous standard of review is found in Rosell v. ESCO, 549 So.2d 840 (La.1989) where the court stated unambiguously:
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong (at 844).
Our inquiry here is thus only whether the jury's verdicts are reasonable in light of the record in its entirety, i.e. are they based on a permissible view of the evidence.
The crux of this case is the position of the lower wire vis-a-vis the building. Plaintiffs contend that construction of the building near the wire was a hazardous condition which should have been seen and corrected by the power company once the building was in place. LP & L for its part does not assert that it was unaware of the location of the wire; its position is rather that the wire did not constitute a hazard, that it exceeded all safety code requirements, and therefore that there was nothing to correct.
As reference to the attached composite diagram and photograph of a model put in evidence show, the building in question is three stories in the center, with a roof sloping down on either side to a single story level. The highest portion of the roof in the center is about 43 feet. Reference to the attached ground plan shows further that as the roof descends from over the third to over the second story it is set back several feet. Another plan, prepared by plaintiffs' expert, Mr. Edward Alba, (P-ALBA2), shows that the eave along this set-back is about 28 feet high, or about one foot below the lowest wire. It must also be pointed out that the ground plan attached does not show that the roof line overhangs the floor plan by about one foot.
As to the position of the lower wire, the plan shows that the closest that wire comes to the second story eave is 6.9 feet, less one foot for the overhang, or 5.9 feet measured horizontally. A report prepared by LP & L employees on the day of the accident noted burn marks on the concrete sidewalk where the feet of the ladder rested, and the positions of these marks were measured out as shown on the plan. The report further noted the burn mark on the wire where it was struck by the ladder, and gave the location of this mark as above and about one foot to the left of the left burn mark on the cement. The measurement from the burn mark on the wire to the corner of the eave was 6 feet, 1 inch.
There was agreement among the most persuasive experts for all parties that the position of the wire 29 feet above the ground and about 6 feet horizontally from the building exceeded the provisions of the applicable National Electrical Safety Code, which recommended respective distances of 15 and 5 feet. Moreover, the overall evidence in the case amply demonstrated that the code requirements were indeed exceeded. We note parenthetically here that plaintiffs urge on appeal that the NESC does not apply to construction sites but only to completed structures, and therefore that this evidence is meaningless. Whatever the merits of that assertion, the record here shows that the building had been certified as complete and ready for occupancy, permanent electrical service had been provided, and tenants had already moved in, prior to the accident. In this circumstance the evidence concerning the code was properly placed before the jury. Plaintiffs do correctly point out, however, that mere compliance with the code is not conclusive that the configuration of the wires was not a recognizable hazard which should have been corrected.
In this regard, we turn first to the evidence relating to how the accident occurred. *791 Both plaintiffs agreed that the ladder was originally set up directly below the center of the third story dormer window. Tabby Williams further testified that before the morning break he had moved it a few feet to the right of the dormer and at that point the top of the ladder was resting on the wall between the dormer and the right hand third story window. His further testimony was that this was the location of the ladder when the accident happened. At trial, Ronald Dumas agreed that this was the position of the ladder when the accident occurred, although he had earlier testified in deposition that it was still under the dormer where it had originally been erected. Both testified that they were attempting to take down the ladder by pulling it away from the building and letting down the extension, preparatory to finally lowering it down. In the course of this activity, the ladder got away from them and made contact with the wire.
Frederick Brooks, offered by LP & L as an expert in the fields of electrical engineering, electrical safety, and electrical accident reconstruction, and so accepted by the court, offered an opinion of the occurrence significantly different from that of plaintiffs. His view was that based on the burn marks on the cement and the wire, the ladder could not have been in the place that plaintiffs claimed it was when they began to take it down. Instead, it had to have been moved, either by Williams alone, or by he and Ronald, while extended to 32 feet, from its original position under the central dormer to a position to the right of the 28 foot high roof indentation. Thus, the top of the ladder would have extended almost four feet above the roof line when it was pulled back from the building and fell onto the wire. Plaintiffs' experts, offered no opinions to refute the explanation of the accident given by Brooks. It is therefore evident to this court that the jury could more than reasonably have concluded from the evidence that at the time immediately before the accident the ladder was positioned to the right of the 28 foot high roof indentation and was protruding several feet above the roof line.
We next address the crucial questions of (a) whether LP & L was required to recognize that its conduct involved a risk of causing injury in the manner of that sustained by plaintiffs, and if so, (b) whether the possibility constituted an unreasonable risk of harm, Levi v. SLEMCO, supra.
The first inquiry, as this court understands it, relates to the foreseeability of such an accident happening. In this regard, plaintiffs' experts, and particularly Harold Olson, were of the opinion that the proximity of the wire to the building was a situation which could obviously lead to an inattentive worker striking the wire with a conducting ladder extended higher than the lowest wire, as in fact, did happen here.
Given that the above proposition is true, the second question is whether this possibility constituted an unreasonable risk of harm. It is this court's further understanding of Levi v. SLEMCO, supra, that it is at this point in the inquiry that the Hand formula, imprecise as it is, comes into play. That is, when the possibility (foreseeability) of the escape of electricity multiplied by the gravity of the harm, if it happens, exceeds the burden of precautions, then failure to take those precautions is negligence on the part of the power company.
Returning to the case before us, there is no question, as Mr. Olsen testified, and as the facts bear out, that it was possible to erect a ladder against the building which would be high enough to come into contact with the lowest, and indeed, any, of the three wires.
On the other hand, Mr. Brooks gave extensive testimony as to the various safety codes applicable to electrical wires and work around them. He first stated in detail that the recommended 5 foot horizontal clearance for bare wires given in the NESC was based on cooperative efforts of various safety groups in the field, and that this determination was predicated on considerations of building maintenance. He pointed out that where no maintenance was required on buildings, the code permitted encroachment of wires closer than the recommended 5 feet. His further testimony was *792 that a number of provisions in the OSHA regulations and the American National Standards Institute standards all caution against the use of aluminum ladders in any area where they might come into contact with overhead wires. He noted that all of these regulations apply equally to employers and employees. He also pointed out that the ANSI standards require warning labels on all metal ladders to the effect that they should not be used near power lines, and that the ladder at issue in this case did carry such a label. He finally noted that these regulations state that if work must be done in the vicinity of power lines which might expose workers to danger, then the power company should be notified in order that proper safety procedures may be instituted.
Beginning then with the proposition that the utility company is charged with the duty, due to its superior expertise in the field, to appreciate dangers not apparent to the average reasonable man, we must ask what was reasonable, given this expertise, in regard to the probability of this accident. Moreover, because the jury apparently found that the company did act reasonably in this matter, we need only inquire as to whether this finding was based on a permissible view of the evidence, Rosell v. ESCO, supra.
As the above discussion of the evidence shows, LP & L had complied with, and indeed exceeded, all existing safety code provisions relating to its wires. It also had a reasonable expectation that both workers and their employers would comport with applicable safety codes governing the use of metallic ladders, and if there were problems, it would be notified. Additionally, it was reasonable to expect that any maintenance work which had to be done on the area of the building which was below the 28 foot high eave would not involve the use of a metal ladder which extended above that eave, and which therefore would not be high enough to come into contact with the 29 foot high wire. Considering all of these factors as well as the facts of the accident, there is certainly a reasonable basis upon which the jury could have determined that from the position of LP & L, the possibility of this incident occurring was remote.
The final question in regard to the liability of LP & L, in spite of the improbability of the accident, is whether the costs of avoiding even this remote possibility of injury was greater than the product of the possibility times the gravity of the injury. In this regard, the plaintiffs' experts suggested several alternatives to the wiring system that was in place. The first was that the wires could have been run on the opposite sides of the poles, and that by using extension insulators they could have been effectively moved some five feet further away from the building. The second, offered by Mr. Olsen, was that the wires could have been raised to forty or sixty feet above the ground. Another was that warning signs could have been placed at the site.
The difficulty with the first proposal is that had the lower wire been five feet further from the building, the ladder would have struck it nonetheless, as was mathematically demonstrated by Mr. Brooks. The second fares no better because the record demonstrates that were the utility forced to abandon its reliance on the NRSC standards, it would be compelled to re-examine and relocate innumerable wires along its rights-of-way, see Washington v. Louisiana Power and Light Co., 555 So.2d 1350 (La.1990). As to the posting of warnings, it is highly questionable on the facts of this case that they would have prevented the accident.
Moreover, the issue of warnings shades over into the negligence of Tabby Williams in bringing about the accident. Williams candidly testified that he was aware of the power lines and knew all such lines to be dangerous, that he had repeatedly been warned in the past by supervisors to be careful around such lines, and that he knew that aluminum ladders conducted electricity. While it is not clear that he saw the similar warnings on the ladder that he was using, it is equally questionable whether he would have heeded similar warnings had they been posted by LP & L.
*793 Considering all of the evidence in this case and the applicable law, we cannot say that the jury's verdicts were the result of an unreasonable view of the evidence. Clearly, there were two permissible views as to much of the evidence, but as mandated in Rosell v. ESCO, supra, when this is the case, the factfinder's choice cannot constitute manifest error.
The final error urged by plaintiffs is that their motion to have the jury view the accident scene was improperly denied. The rule in this regard is that it is within the discretion of the trial judge whether to permit such an inspection. Generally, such a procedure is used only when the evidence is so confusing and conflicting that the trial judge deems it necessary for the jury to inspect the site and visualize the occurrence, Landry v. Jefferson Davis Parish School Board, 478 So.2d 194 (La.App. 3rd Cir.1985). In the present matter, we cannot say that the judge abused his discretion in refusing to permit an inspection. Although there were some conflicts about the configuration of the site, the numerous photographs, the scale model of the area, and the various surveys and drawings, were more than sufficient to apprise the jury of all pertinent facts about the scene.
For these reasons, we hold that the jury verdicts exonerating LP & L from fault in this matter were not manifestly erroneous, and therefore affirm those verdicts.
AFFIRMED.
*794