532 So.2d 798 (1988)
Yosheda WASHINGTON and John Washington, Jr., Individually and on Behalf of Their Deceased Father, John Washington, Sr.
v.
LOUISIANA POWER AND LIGHT, XYZ Insurance Co., Telex Communications Corporation, ABC Insurance Co., Hy-Gain/Telex Electronics Corp., et al.
No. 88-CA-0221.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 1988.
Rehearing Denied November 16, 1988.
*799 Monroe & Lemann, Stefan Kazmierski, W. Glenn Burns, New Orleans, for defendant-appellant Louisiana Power and Light.
Gertler, Gertler & Vincent, M.H. Gertler, Rodney P. Vincent, Basile J. Uddo, New Orleans, for plaintiffs-appellees.
Before GARRISON, CIACCIO and WARD, JJ.
CIACCIO, Judge.
Defendant Louisiana Power and Light appeals a judgment against it for the electrocution of John Washington, Sr. Plaintiffs are the major daughter and son of John Washington, Sr. Finding that L.P. & L. did not breach any duty owed to decedent, we reverse.
There were no witnesses to decedent's death. His body was found in his backyard on the ground next to the base of his CB antenna. The antenna extended upward to approximately 22' above the ground where it was perilously close to a high-voltage power line strung, at its lowest point overhead, approximately 21' above the ground.
After an autopsy, the assistant coroner determined that decedent had been electrocuted. Although he could not determine an accurate time of death, based upon the physical evidence developed during the autopsy the coroner opined that decedent had not died instantaneously upon receiving the fatal electric shock, but he had been rendered unconscious. He did not know, however, how long after the shock decedent had lived, declaring that it could have been one to two minutes or up to two hours.
Decedent's body was found between 4:00 and 4:30 in the afternoon. Earlier that afternoon at approximately 1:30, L.P. & L. had received calls complaining of a "lights out" situation in the neighborhood. A serviceman was dispatched to investigate.
The serviceman determined that a fuse had blown and ascertained the area of affected homes. Driving his service truck slowly on the streets past the affected homes, the serviceman inspected the affected power line to determine what had caused the fuse to blow. He did not find anything which he suspected had caused the fuse to blow. He did not notice decedent's antenna.
He re-energized the power line. The fuse did not blow again. He concluded that whatever had caused the fuse to blow had been resolved, and he left the area.
Decedent had been a CB enthusiast for years prior to his death. He had erected an antenna on his house, and had placed *800 the antenna involved here in a corner at the rear of his backyard. When at its regular rear-corner placement, the antenna was horizontally removed from the power line by approximately 23'.
Several years before his death, while working with his son on the antenna, decedent had allowed the antenna to contact the power line. Both men had received a shock and minor injuries. On that occasion decedent manifested awareness of the danger involved, declaring to his son that he could have been killed. He later made similar declarations to others.
L.P. & L. had encountered a "lights out" situation and had investigated. On that occasion investigators discovered that the contact made by decedent's antenna had caused the "lights out." At that time and numerous times thereafter, decedent had requested that L.P. & L. relocate the power line underground. L.P. & L. responded that the line could be placed underground, but at decedent's cost.
In Jones v. Aetna Casualty and Surety Co., 430 So.2d 1134 (La.App. 1st Cir.1983), the court provided the following survey of recent supreme court cases establishing the law and analysis applicable to determining utility company liability for the electrocution of persons contacting overhead power lines.
In Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982), the Louisiana Supreme court held that a utility company is not absolutely liable for the electrocution of persons coming into contact with overhead electrical wires because:
"... the transmission of electricity over isolated high tension power lines is an everyday occurrence in every parish in this state and can be done without a high degree of risk of injury...". 418 So.2d at 498, 499.
Consequently, the transmission of electricity through overhead transmission lines is not an ultrahazardous activity requiring the imposition of absolute liability.
On the other hand, the Court further noted that strict liability under C.C. Art. 2317 differs in analysis from ordinary negligence cases only in determining the existence of a duty. In ordinary negligence cases the duty arises from an owner or custodian's knowledge or imputed knowledge of an unreasonable risk of injury from the thing owned or in custody. In strict liability cases the duty is implied from the mere fact of the owner's relationship with and responsibility for the damage causing thing. Utility companies already know the risks involved to a person who comes into contact with a "hot" line not wrapped with insulating material. Thus, La.C.C. Art. 2317 is not helpful, and the analysis is simply one of whether, under the circumstances, the utility company took reasonable steps to protect persons against the known risk of coming into contact with the lines. Applying this analysis the Court found no liability in Kent.

In the recent case of Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983), the Louisiana Supreme Court reviewed a case involving injuries to a worker who had made contact with electrical lines. Using the Kent analysis for the first time since handing down the Kent decision, a finding of no liability on the part of the utility company was reversed and damages awarded. It was pointed out that under rules of ordinary negligence electric transmission companies are required to exercise utmost care to reduce the hazard of injury as far as practicable. Factually, Hebert involved the electrocution of an experienced construction worker who was working on top of a metal building placing him in immediate proximity to a transmission line located 26.4 feet from the ground, but located in an industrial park where the construction of metal buildings close to the transmission lines was commonplace. Hebert made contact with the line with a 20 foot piece of angle iron. Another worker had been similarly injured earlier the same year. The method of construction was that usually employed. The Court held that the risk of injury was more easily associated with the lines than it would have been in an area where contact would have to have been from *801 the ground such as in Kent. Consequently, there was a duty to insulate the lines, to warn of the danger or to take other proper and reasonable precautions.
In Hebert the Court referred liberally to Simon v. Southwest La. Elec. Membership, 390 So.2d 1265 (La.1980). There a man was fatally shocked when a fortytwo foot drilling pipe he was removing at ground level from a well hole touched an overhead power line 26.7 feet from the ground. Employees of the utility company were aware of the drilling operation and had warned one of the individuals involved of the potential danger should contact be made with the electrical lines 15 feet away. The Court pointed out that although electric companies that utilize high power lines are required to exercise the utmost care to reduce hazards to life as far as practicable, they are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living. Accordingly, it was concluded that the warning given, coupled with the placement of lines so that their presence was apparent, were sufficient to discharge the utility's duty of care.
In Jones, the plaintiff, who was assisting in taking down a television antenna, was injured when the antenna struck a power line. The Jones court concluded that the case before it was similar to Kent and Simon, and distinguishable from Hebert. (But compare Meche v. Gulf States Utility Company, 436 So.2d 538 (La.1983), which was handed down after Jones.) The court recognized that in Hebert the court found it significant that there was available no really safe method of placing a 20 ft. beam within 3-9 feet of a power line, but that there was a safe method of taking the antenna down. Jones at 1137. (In Meche, the injured parties were working in the dark and were unaware of their proximity to the power line.)
We find that this case is similar to Kent, Simon, and Jones. See also Creppel v. Louisiana Power and Light Co., 514 So.2d 239 (La.App. 5th Cir.1987), writ denied 516 So.2d 131 (La.1988). Decedent was aware of the power line and the hazards it imposed. It was not reasonably foreseeable that decedent would intentionally expose himself to those hazards by moving his antenna, in its upright position, into contact with the power lineparticularly since he had done so previously and had been fortunate enough to escape serious injury. Decedent could have moved his antenna safely. For example, he could have lowered his antenna until it was parallel to the ground, dismantled it if necessary, and then moved under the power line. L.P. & L. cannot be held liable for an incident created by decedent in what he knew was a dangerous situation. See Jones at 1138.
Even assuming that L.P. & L. should have anticipated that decedent could come into contact with the power line, its duty was to insulate the line, or to give adequate warning of the danger, or to take other reasonable and proper precautions to prevent injury. Simon v. Southwest La. Elec. Membership, 390 So.2d 1265 (La. 1980). We find that L.P. & L. discharged its duty. The power line was insulated by isolation, being placed above the minimum requirements of the National Electric Safety Code and well out of reach of reasonably anticipated surface activity. Although the utility company was aware of decedent's antenna (because of the first contact incident), it was not aware, nor could it reasonably anticipate, that decedent would try to move the upright antenna under the power line or when such activity might take place so it could implement any reasonable and proper temporary precautions. See Simon and Jones. Further, the expert testimony established that using an insulating material around the wire, although such material is available, was not a reasonable precaution because of the relatively fast degeneration of the insulating material on above-ground high-voltage lines; and re-locating the line underground only exchanged one set of hazards for another. See, e.g., Williams v. City of New Orleans, 433 So. 2d 1129 (La.App. 4th Cir.1983). Decedent *802 was fully aware of the dangers of contacting the power line, further warning of the dangers would have been ineffective toward averting the accident, so liability does not follow. Creppel at 244, citing Aucoin v. Louisiana Power and Light Co., 490 So.2d 1088, 1090 (La.App.2d Cir.1986), writ denied 491 So.2d 381 (La.1986). L.P. & L. had no duty to take any further precautions.
We find that any duty owed by L.P. & L. to protect decedent from the hazards imposed by its high-voltage power line was properly discharged. We find no breach of duty. We hold, therefore, that the jury was clearly wrong in concluding that the fault for this accident rested in L.P. & L.
Plaintiffs also raise as an issue the duty of the serviceman dispatched to investigate the "lights out" situation. They argue that if the serviceman had properly performed his task he would have noticed the antenna close to the power line and then would have found decedent in time to render life-saving aid. The medical evidence established that decedent may have lived for up to two hours after receiving the fatal shock, but it also established that decedent may have died within one to two minutes of receiving the shock. On this evidence no fact finder can do better than to speculate on whether decedent might have been alive if the serviceman would have found him. Even assuming a duty (which we neither discuss nor decide), this evidence cannot carry the plaintiffs' burden to establish a breach of duty necessary to establish fault.
For the reasons assigned, we reverse the judgment appealed and enter judgment in favor of appellants dismissing plaintiffs' suit at their cost.
REVERSED.