555 So.2d 1350 (1990)
Yosheda WASHINGTON and John Washington, Jr., Individually and on Behalf of Their Deceased Father, John Washington, Sr.
v.
LOUISIANA POWER AND LIGHT COMPANY, XYZ Insurance Company, Telex Communication Corporation, Hy-Gain/Telex Electronics Corporation, DEF Insurance Company and GHI Insurance Company.
No. 88-C-3035.
Supreme Court of Louisiana.
February 5, 1990.
Rehearing Denied March 8, 1990.
*1351 Meyer Gertler, Rodney Vincent, Basile Uddo, Gertler, Gertler & Vincent, for applicant.
Eugene G. Taggart, George F. Riess, Kathryn J. Lichtenberg, William Burns, Monroe & Lemann, for respondent.
DENNIS, Justice.
We granted certiorari in this power line accident case to review the Court of Appeal's judgment setting aside a jury award to the adult children of a man who was electrocuted when he accidentally allowed a citizens band radio antenna to come into contact with an uninsulated 8000 volt electrical wire that spanned the backyard of his residence. Washington v. Louisiana Power & Light, 532 So.2d 798 (La.App. 4th Cir.1988). We affirm. The jury verdict for the plaintiffs was manifestly erroneous. Although the gravity of the injury in a powerline accident is usually severe, under the circumstances of this case the magnitude of the risk was not great because the possibility that the radio antenna would have been brought into contact with the powerline was very slight: five years before his fatal accident the deceased narrowly escaped death or serious injury in a similar mishap; he expressed concern for his life and afterwards exercised great caution and avoided moving the antenna near the powerline; inspections by the power company would have shown only that the antenna was stationed securely at a safe distance from the power line right-of-way; on the occasion of his fatal accident, however, the deceased deliberately and for no apparent good reason raised the antenna from a position lying on the ground a safe distance from the powerline and walked with it in an erect attitude to within a dangerous proximity of the uninsulated wire, where he was electrocuted. Because it was clearly unlikely that the deceased had forgotten about the hot wire, a warning by the power company would not have averted the accident. Consequently, the only safety measures the company might have taken to avoid the accident were to insulate the line, place it underground or raise it to an abnormal height. We conclude that the burden of taking any of these precautions in a case such as this clearly outweighs the magnitude of the risk. This is not a situation in which there was a significant possibility of an accident due to ignorance or inadvertence. If the power company were to be required to redesign or relocate its line here, then it would be forced to do so immediately, and thereafter continually, in the hundreds, perhaps thousands, of locations along its high voltage line rights-of-way at which tall television or radio antennas are safely installed.
The deceased, John Washington, Sr., lived in a subdivision in Marrero, Louisiana with a back yard 118 feet wide. LP & L had a five foot right-of-way across the decedent's backyard, over which it had strung an uninsulated eight thousand (8000) volt electrical distribution line, approximately 21 and ½ feet above the ground and 23 feet inside the rear property line and fence. LP & L's right of way and power line ran through many lots adjacent to and beyond *1352 Mr. Washington's property in both directions. The line was clearly visible.
In the 1970's Mr. Washington began a citizens band radio hobby using a CB antenna on top of his house. Sometime later in the 1970's the decedent erected a second antenna in a corner of his backyard. He stationed the second antenna as far from the other as possible to reduce interference. The new antenna was designed to fit into a long pipe affixed to a pedestal and to be raised or lowered as if it were a boom. The new antenna itself was only 21' 4" long, but it extended 62 or 63 feet above ground when raised to a vertical posture within the pipe. The pedestal containing the pipe and the antenna was implanted one foot inside the fence which was located on the decedent's rear property line. The pipe assembly was designed so that the antenna could be raised or lowered only along the rear property line in a direction parallel to and at a safe distance from the powerline. Charles Morton, a close friend who helped the decedent install the antenna, testified that Mr. Washington and he were aware that it could create an electrical hazard if it were not positioned carefully. They chose the back corner of the lot as the safest location.
In 1980 Mr. Washington and his son removed the antenna from the pipe and attempted to move it under the power line toward the house. Although the antenna could be carried by two persons with its pole or mast parallel to the ground, the four rod-like elements that radiated in as many directions from the base of the antenna made it difficult to get under the power line without making contact. Each element was eight feet long so that when two elements rested on the surface the other two extended at 45 degree angles to a height of some eleven feet in the air; and, of course, one of the elements would extend even higher when the antenna was picked up or rotated. Mr. Washington's son testified that as they were attempting to "tip" the antenna and get it under the power line the uppermost element made contact with the hot wire. The resulting shock knocked the decedent's son to the ground and burned him slightly on the hand; it also burned large blisters on Mr. Washington's hand. The son testified that, after the accident, his father said "That could have killed me."
The electrical accident resulted in a blackout in the neighborhood. LP & L investigators determined that Mr. Washington and his son had caused the power failure by touching the power line with the antenna. They discussed the matter with Mr. Washington in his backyard before leaving and reenergizing the line.
After his close call Mr. Washington was very cautious with the antenna and did not attempt to move it under the power line or even carry it away from the back property line. His children and Mr. Morton testified that several times after the accident, the decedent requested that LP & L insulate the line or move it underground, indicating his continued awareness of the danger. LP & L responded that it could do so only at Mr. Washington's expense. At trial LP & L presented evidence that a Public Service Commission order stated that utility companies should charge a customer for the cost of burying his line underground, rather than passing on the cost of that benefit to all customers.
In January, 1985 Mr. Washington, with the help of his friend, Mr. Morton, lowered the antenna and removed it from the pipe. Mr. Morton testified that the decedent had planned to work on the antenna when some parts he had ordered arrived. Mr. Morton said that they set the antenna down near the property line and were careful not to move it in the direction of the power line because they knew it and the other lines around it were dangerous.
On January 27, 1985, one week after Mr. Washington and Mr. Morton lowered the antenna, residents in the neighborhood reported an electricity blackout at 1:30 p.m. Ronnie Bushnell, an LP & L service lineman, drove slowly through the subdivision visually checking the line. Although he and a helper searched in this manner for 30 to 45 minutes, they were unable to find the source of the power failure. They re-energized the power line and left the area at 2:28 p.m.
*1353 About 4:30 p.m. on the same day a friend of Mr. Washington discovered him lying in his backyard. An emergency medical technician testified that when he arrived rigor mortis had set in. The decedent's body was located next to his CB antenna, with the mast of the antenna sticking straight up in the air. The tip of the antenna was within a foot of the uninsulated 8000 volt power line. Decedent's body was located horizonally six to eight feet from the line lying on top of an element and one or two feet from the base of the antenna. The pathologist who performed the autopsy on the decedent's body determined that electrocution was the cause of death, and that the decedent did not immediately die, but that he had continued to breathe for anywhere from one or two minutes to one or two hours after having received the shock.
After a trial on the merits, a jury found LP & L at fault in the accident and awarded plaintiffs $500,000 for pain and suffering and the loss of life of the decedent and $75,000 for each plaintiff's loss of love, affection and support. LP & L appealed suspensively. The Court of Appeal, noting that the decedent had five years earlier received an electrical shock when he touched the antenna to the same line, and had since that time been extremely careful to never move the antenna alone or towards the line until the day of the fatal accident, reversed, concluding that LP & L did not breach any duty owed to the decedent. Washington v. LP & L, 532 So.2d 798 (La.App. 4th Cir.1988). This court granted certiorari. 545 So.2d 1043 (La. 1989).
When the evidence is clear, as in the present case, that the power company either knew or should have known of the possibility of an accident that materialized in the decedent's electrocution, the remaining negligence issue is whether the possibility of such injury or loss constituted an unreasonable risk of harm. See Levi v. SLEMCO, 542 So.2d 1081 (La.1989). Such a case invites "a sharp focus upon the essential balancing process that lies at the heart of negligence." Malone, Work of Appellate Courts, 29 La.L.Rev. 212, 212 (1969); see also Allien v. LP & L, 202 So.2d 704 (La.App. 3d Cir.1967). In this regard, we recently held that the power company's duty to provide against resulting injuries, as in similar situations, is a function of three variables: (1) the possibility that the electricity will escape; (2) the gravity of the resulting injury, if it does; (3) the burden of taking adequate precautions that would avert the accident. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the risk is unreasonable and the failure to take those precautions is negligence. Levi v. SLEMCO, supra; see L. Hand, J., in Conway v. O'Brien, 111 F.2d 611, 612 (2nd Cir.1940), rev.'d 312 U.S. 492, 61 S.Ct. 634, 85 L.Ed. 969 (1941) and United States v. Carroll Towing Co., 159 F.2d 169, 173 (2nd Cir.1947); see also Allien v. LP & L Co., supra.
Applying the negligence balancing process, we conclude that although there was a cognizable risk that the antenna stationed in the corner of Mr. Washington's backyard could be lowered and moved to within a dangerous proximity of the power line, that possibility could not be characterized as an unreasonable risk and the power company's failure to take additional precautions against it was not negligence.
Under the circumstances, there was not a significant possibility before the accident that Mr. Washington or anyone acting for him would detach the antenna and attempt to carry it under or dangerously near the power line. Standing alone, Mr. Washington's 1980 accident might have caused an objective observer to increase his estimate of the chances that this particular antenna might be handled carelessly. The other surrounding circumstances, however, overwhelmingly erase any pre-accident enlargement of the risk at that site. Except for the single occasion of the 1980 accident, the antenna was stationed safely in the corner of the backyard for many years, one to three years before the 1980 mishap and five years afterwards. Most of that time it was maintained safely in the pipe receptacle which, by Mr. Washington's design, allowed *1354 it to be lowered only in a safe direction. Between his close call in 1980 and his fatal accident in 1985, Mr. Washington had never been known to handle the antenna carelessly. Indeed, after he and his son narrowly escaped death or serious injury in 1980, his remarks to friends and relatives indicated that the experience had convinced him to keep the antenna far away from the power line. That he continued to be aware of the danger and take exemplary precautions to avoid it until his fatal accident was further illustrated by the care that he and his friend took when they lowered and laid it next to the fence several days before the accident.
The likelihood that the antenna in this case would be brought into contact with the power line was not as great as the chances of an electrical accident in situations creating significant potential for injuries to victims who may contact or come into dangerous proximity with the powerline due to their unawareness of or inadvertence to the charged wire. See, for example, Levi, supra; Meche v. Gulf States, 436 So.2d 538 (La.1983); Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983); Casanova v. Ballard, 533 So.2d 1005 (La.App. 1st Cir.1988), writ denied, 537 So.2d 1163 (La.1989). See also Harper, James & Gray, The Law of Torts § 16.9, n. 8, comparing Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983) with Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982).
Prior to the accident, the anticipated gravity of the loss if the risk were to take effect was, of course, of a very high degree. The deaths and serious injuries in this and other electrical accidents verify that the weight of the loss threatened by a power line accident is not trivial. While some accidents, such as Mr. Washington's 1980 mishap, do not lead to dire consequences, a consideration of all losses resulting from this type of risk indicates that the gravity of the loss if it occurs is usually extreme.
Yet when this high degree of gravity of loss is multiplied by the very small possibility of the accident occuring in this case, we think it is clear that the product does not outweigh the burdens or costs of the precautions of relocating or insulating the power line. This does not mean, of course, that it would not have been worth what it would have cost to place the line underground or to insulate it in order to save the decedent's life if it had been known that the accident would happen or even if the chance of it occurring had been greater. Nor does it mean, on the other hand, that we stop with a consideration of only the burden of an effective precaution in this single case. Common knowledge indicates that within any power company's territory there probably are a great number of situations involving antennas that have been safely installed, but which conceivably could be detached and carelessly moved about dangerously near a power line. In fairness, in this case, in which the coexistence of the powerline and the safely installed antenna was no riskier than countless other similar coexistences not considered to involve negligence, the burden to the company of taking precautions against all such slight possibilities of harm should be balanced against the total magnitude of all these risks, including the relatively few losses resulting from the total of all those insignificant risks. Just as single case applications of the Hand formula can understate the benefits of accident prevention by overlooking all other accidents that could be avoided by the same safety expenditures, See Rodgers, Negligence Reconsidered: The Role of Rationality in Tort Theory, 54 So.Cal.L.Rev. 1, 8 (1980), the burdens of taking precautions in all similar cases may be depreciated by single case consideration here.[1]
*1355 The foregoing, of course, is merely a shorthand expression of the mental processes involved in such considerations. We cannot mathematically or mechanically quantify, multiply or weigh risks, losses and burdens of precautions. As many scholars have noted, the formula is primarily helpful in keeping in mind the relationship of the factors involved and in centering attention upon which of them may be determinative in any given situation. See D. Robertson, W. Powers, Jr. & D. Anderson, Cases and Materials on Torts, p. 85 (1989); Harper, James, & Gray, The Law of Torts § 16.9 (1986); Fleming, Is There a Future for Tort? 44 La.L.Rev. 1193, 1200 (1984); Epstein, A Theory of Strict Liability 2 The Jour. of Legal Studies 151, 157 (1973).[2] Nevertheless, the formula would seem to be of greater assistance in cases of the present type, in which the power company's ability to perceive risks is superior and its duty is utmost, See Levi, supra, at 1085-86, than other notions, such as "reasonable man", "duty" or "foreseeability", for example, which must be little more than labels to be applied after some sort of balancing or weighing that the formula attempts to describe. In the present case, the balancing process focuses our attention on the fact that the possibility of an accident appeared to be slight beforehand and on the reality that precautions against such slight risks would be costly and burdensome because they exist in great number and have not usually been considered unreasonable or intolerable.
Plaintiffs also assign as error the Court of Appeal's rejection of their argument that the LP & L serviceman who answered the power outage complaint was guilty of negligence in not discovering that Mr. Washington had collapsed in his back yard and that this negligence was a cause in fact and legal cause of Mr. Washington's death. We have carefully reviewed the evidence and the parties' oral and written arguments regarding this issue. We conclude that the Court of Appeal's disposition is correct for the reasons stated in its opinion. See 532 So.2d at 802.
For the reasons assigned, the judgment of the court of appeal is affirmed.
AFFIRMED.
LEMMON, J., concurs.
DIXON, C.J., and WATSON, J., dissent.
NOTES
[1] See Harper, James & Gray, The Law of Torts, § 16.9, p. 479: "[D]angerous conduct may still be reasonable if it is useful enough and effective precautions are disproportionately burdensome in terms of expense, inconvenience, or alternative risk. Thus a rapid transit company has been held not negligent in maintaining station platforms with only a six foot clearance between newstands and the edge of the platform, the court saying, `If this form of construction is negligent, then hundreds, perhaps thousands, of railway stations must be rebuilt.'" (quoting Williams v. N.Y. Transit Corp., 272 N.Y. 366, 369, 6 N.E.2d 58, 59 (1936); citing cf. Cooper v. City of Dallas, 83 Tex. 239, 18 S.W. 565 (1892); Terry, Negligence, 29 Harv.L.Rev. 40, 45 (1915) and other authorities.)
[2] As Professor Epstein has observed, Judge Hand himself stated it well only two years after Carroll Towing was decided: "But of these factors care [or precaution] is the only one ever susceptible of quantitative estimate, and often that is not. The injuries are always a variable within limits, which do not admit of even approximate ascertainment; and, although probability might theoretically be estimated, if any statistics were available, they never are; and, besides, probability varies with the severity of the injuries. It follows that all such attempts are illusory, and, if serviceable at all, are so only to center attention upon which one of the factors may be determinative in any given situation." Moisan v. Loftus, 178 F.2d 148, 149 (2d Cir.1949).