LANIER, Judge.
This is a suit for damages in tort alleging that the plaintiff was injured when the aluminum handle of a mop he was using came in contact with an overhead electrical power line. The alleged manufacturer[1] of the mop, Bob Lastor d/b/a Lastor Distributing Company (Lastor), and his alleged insurer[2], State Farm Fire & Casualty Company (State Farm), filed motions for summary judgment asserting there were no disputed issues of material fact and they were entitled to be dismissed from the suit as a matter of law. After a hearing, the trial court granted the motions for summary judgment and dismissed the plaintiff’s petition against Lastor and State Farm with prejudice. The plaintiff took this devolutive appeal.
UNCONTESTED FACTS[3]
The plaintiff, Eddie Putman, began working for Independent Tank Cleaning Services, Inc. (Independent) on a part-time basis in 1981, when he was a junior in high school. He became a full-time employee of Independent in May of 1982, after he graduated. The premises of Independent are located at 6735 Airline Highway, Baton Rouge, Louisiana. By June of 1985, Put-man was a shift supervisor and directed the work of three other employees. The manager for the Independent operation was John Diamond.
Prior to 1985, the employees of Independent would clean tank trailers with mops made with 24 ounce mop heads and 60 inch wooden handles. Independent bought the mop heads and mop handles separately from Lastor. Lastor bought the mop heads and mop handles from the Layflat Mop Company of Shreveport, Louisiana. Because these mop handles were only 60 inches long, the Independent employees were required to climb into the tanks on the trailers to mop them out. In the early part of 1985, Diamond determined that a lot of time could be saved if a trailer could be cleaned from the outside with a long *1225 handled mop. An employee would not have to climb into a trailer tank to clean it.
Approximately two or three months prior to June of 1985, Diamond commenced discussing the use of a long handled mop with Lastor. Initially, Diamond considered using a galvanized pipe handle for the mop, but he concluded that it would be too heavy. Then Diamond considered using a plastic pipe handle for the mop, but he concluded it would be too flimsy. Ultimately, Diamond asked Lastor to make one long handled mop and specified that it have a 16 foot handle made of 1 inch aluminum pipe bolted to a wooden mop handle. La-stor bought a 20 foot length of 1 inch aluminum pipe from Gulf Coast Supply Company of Baton Rouge, Louisiana, and cut it down to 16 feet with a hacksaw. A wooden mop handle was slid into the aluminum pipe, and the two were bolted together with bolts obtained from the Quality Bolt Company of Baton Rouge, Louisiana. This was the first and only time that La-stor sold this type of mop to Independent.
Putman began using the long handled mop after it was acquired by Independent. On June 19, 1985, Putman reported for work at Independent’s yard at 6:00 a.m. Independent’s yard was essentially divided into three areas: a covered area with bays for cleaning trailers, a parking area, and an open area.[4] An electrical power line owned by the Gulf States Utilities Company (GSU) ran over the Independent yard. This power line was already at the site when Put-man went to work for Independent in 1981, and he knew it was there. The record does not reflect the height of the GSU power line from the ground. At approximately 10:30 a.m., Putman received a call from the dispatcher for Mission Petroleum advising that one of its trailers was in the Independent yard, the trailer was scheduled to be taken to EXXON shortly, the trailer had water in it, and someone was needed to mop the trailer out. Putman got the long handled mop and went into the open area of the yard to the trailer. The trailer was approximately 12 feet high, and no one was around it. Putman put the mop on the side of the trailer, climbed up on it, and opened the trailer tank lid. He observed water in the bottom of the tank. He raised the mop so he could put it into the tank, and the mop came in contact with the GSU power line. Putman received a severe electrical burn on his right foot which required skin grafting.
SUMMARY JUDGMENT
The law on summary judgments applicable to this case is set forth in Robertson v. Our Lady of the Lake Regional Medical Center, 574 So.2d 381, 383-385 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1136 (La.1991) as follows:
LSA-C.C.P. art. 966 provides, in pertinent part:
A. The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed....
B. ... The adverse party may serve opposing affidavits prior to the date of the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.
LSA-C.C.P. art. 967 provides, in pertinent part:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein....
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set *1226 forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
[[Image here]]
It is well settled that a motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits show there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. ... The burden is upon the mover for summary judgment to show that no genuine issue of material fact exists, and only when reasonable minds must inevitably conclude that mover is entitled to judgment as a matter of law is summary judgment war-ranted_ Under LSA-C.C.P. art. 967, an adverse party may not rest upon the mere allegations or denials in his pleadings when a motion for summary judgment is made and supported by affidavits ....
On motion for summary judgment, it must first be determined that the supporting documents presented by the moving party are sufficient to resolve all material issues of fact; if they are not sufficient, summary judgment should be denied. It is only if they are sufficient that the burden shifts to the opposing party to present evidence that a material fact is still at issue; only at this point may the adverse party no longer rest on the allegations contained in his or her pleadings....
In certain instances, the failure of an adverse party to file counter-affidavits does not automatically entitle the moving party to summary judgment_ However, if the moving party has established both that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law, it is incumbent upon the adverse party to set forth specific facts showing that there is a genuine issue for trial....
Summary judgments are not favored, and any reasonable doubt should be resolved against the mover_ In determining whether material issues have in fact been disposed of, any doubt is to be resolved against granting the summary judgment and in favor of trial on the merits. (Citations omitted)
LASTOR’S DUTY
In paragraph 11 of his petition, Putman asserts that Lastor is liable for his accident and injuries as follows:
11.
Defendant Lastor Distributing Co. is at fault and liable to the plaintiff in the following, non-exclusive particulars:
A) failure to properly design the mop when defendant knew or should have known of the intended use of the product;
B) failure to properly construct the mop when defendant knew or should have known of the intended use of the product;
C) failure to provide adequate safety protection when defendant knew or should have known of the intended use of the product;
D) failure to warn the consumer of the dangerous propensities of its product;
E) the use of substandard materials in the design and construction of its product;
F) other acts of negligence to be proved at the trial herein.
In his appellate brief, Putman asserts that the “trial court committed error in taking upon itself to decide the status of Lastor Distributing Company when there exists a material issue of fact which would permit a jury to reach an alternative conclusion.” He specifically asserts that “under the circumstances a jury could conclude that the danger was not obvious to plaintiff, and it is just such a situation that warning may serve to make clear and remind individuals of a hazard that might not otherwise be readily apparent to the common laborer busily attempting to carry out his assigned job tasks.” Lastor and State Farm respond that Lastor did not have a duty to warn because the danger was obvious to the ordinary user, Lastor did not “manu *1227 facture” or “design” the mop, and the mop was properly constructed.
The duties of four legal persons are involved in this case: (1) Putman, (2) Independent, (3) GSU and (4) Lastor. An analysis of the duties owed by Putman, Independent and GSU is helpful in determining the duty owed by Lastor.
The uncontested facts show that the GSU power line was serving the Independent yard when Putman began working for Independent in 1981, and that Putman was “generally” aware of the power line, although he was not always “consciously” aware of it. In this factual posture, Putman’s duty has been defined in Dobson v. Louisiana Power and Light Company, 567 So.2d 569, 573 (La.1990) as follows:
Any person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have.... A reasonable person who has an ordinary amount of exposure to the facts of modern life in America should be treated as though he knows that any electrical line could be dangerous. (Citations omitted)
Independent, as Putman’s employer, had the primary duty to provide him with a safe place to work, including proper tools, equipment, and methods for safely performing his duties. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La. 1982). Cf. Sibley v. Gifford Hill and Company, Inc., 475 So.2d 315 (La.1985).
GSU, as the owner and operator of the power line, had the primary duty to provide for the safety of the line. This duty is defined in Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081, 1084-1085, 1088 (La.1989) as follows:
A power company is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have.... If the company has in fact more than a minimum of these qualities, it is required to exercise the superior qualities that it has in a manner reasonable under the circumstances.... The standard becomes, in other words, that of a reasonable person with such superi- or attributes....
It is well recognized that those who engage in certain activities or come into certain relationships with people or things are under a peculiar obligation to acquire knowledge and experience about that activity, person or thing....
By the same token, a company which maintains and employs high power lines is required to exercise the utmost care to reduce hazards to life as far as practicable.... Pursuant to this duty, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects_ Consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties.
[[Image here]]
Plaintiff’s experts testified that several different kinds of precautions could and should have been taken to eliminate or reduce the hazard caused by the operation of the bare high voltage line at the E.C. Stuart # 2 Well: (1) The power company could have routed the line differently so as to avoid creating a hazardous driveway crossing and a dangerously small workspace abutting the hot high voltage wires; (2) The company simply could have raised the line to a safer level at the site of the accident; (3) The utility could have replaced the line at the well with factory installed insulation or could have insulated the line temporarily with rubber hose type insulation; (4) The company could have attached one of various forms of warnings, i.e., signs on poles, *1228 stakes or on the line itself; or orange balls on the wires; (5) The power utility could have installed the line underground instead of overhead at the accident site. With the possible exception of underground installation, these experts indicated that the burden of these precautions were inexpensive and did not outweigh the magnitude of the risk. (Citations omitted)
See also Washington v. Louisiana Power and Light Company, 555 So.2d 1350 (La. 1990); Meche v. Gulf States Utilities Company, 436 So.2d 538 (La.1983); Hebert v. Gulf States Utilities Company, 426 So.2d 111 (La.1983).
The duty of Lastor[5] is set forth in Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110, 114-115 (La.1986) as follows:
A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product.... This theory considers the product’s danger-in-fact, not whether the manufacturer perceived or could have perceived the danger, because the theory’s purpose is to evaluate the product itself, not the manufacturer’s conduct. Likewise, the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant_ Under this theory, the plaintiff is not entitled to impugn the conduct of the manufacturer for its failure to adopt an alternative design or affix a warning or instruction to the product. A warning or other feature actually incorporated in the product when it leaves the manufacturer’s control, however, may reduce the danger-in-fact. If a plaintiff proves that the product is unreasonably dangerous per se, it is not material that the case could have been tried as a design defect case or other type defect case.
A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be.... A manufacturer or supplier who sells a product with a construction or composition flaw is subject to liability without proof that there was any negligence on its part in creating or failing to discover the flaw. Evidence of what knowledge was available to the manufacturer has no relevance in such cases because the product, by definition, failed to conform to the manufacturer’s own standards ....
Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user_ In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby_ A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved_ Under the failure to warn theory evidence as to the knowledge and skill of an expert may be admissible in determining whether the manufacturer breached its duty.
A product may be unreasonably dangerous because of its design for any one of three reasons: (1) A reasonable person would conclude that the danger-in-fact, *1229 whether foreseeable or not, outweighs the utility of the product. This is the same danger-utility test applied in determining whether a product is unreasonably dangerous per se.... This first reason for concluding that a design is defective is governed by the same criteria for deciding whether a product is unreasonably dangerous per se. The overlap in categories makes it unnecessary to decide whether a product’s defect is one of design or of another kind if the product is proven to be unreasonably dangerous per se. (2) Although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or, (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences .... In regard to the failure to use alternative products or designs, as in the duty to warn, the standard of knowledge, skill and care is that of an expert, including the duty to test, inspect, research and experiment commensurate with the danger_ Accordingly, evidence as to whether the manufacturer, held to the standard and skill of an expert, could know of and feasibly avoid the danger is admissible under a theory of recovery based on alleged alternative designs or alternative products. Such evidence is not admissible, however, in a suit based on the first design defect theory, which is governed by the same criteria as proof that a product is unreasonably dangerous per se.
(Citations omitted; footnote omitted)
The uncontested facts show that the mop is not unreasonably dangerous per se and is not unreasonably dangerous in construction or composition. Further, the uncontested facts show that the design of the mop was determined by John Diamond, Independent’s manager, and not by Lastor. Thus, the only remaining issue to be determined is whether Lastor had a duty to warn mop users about the dangers of bringing the mop in contact with high voltage electrical power lines.
It is implicit in the ruling of the trial court judge that he found that Lastor had no duty to warn under the undisputed facts of this case. Putman has cited no cases to us, and we have found none, that hold that a person who sells equipment to an employer (or other person) has a duty to place a warning on it that it would be dangerous for an employee (or other person) to bring the equipment in contact with a high voltage electric power line. As previously indicated, Independent had the primary duty to provide Putman with a safe place to work and safe equipment; GSU had the primary duty to provide for the safety of its power line and provide appropriate warnings of its danger should the facts and circumstances require them; and Putman had a duty to recognize that an electrical power line could be dangerous. The potential for danger in this case emanates from the power line, not from the mop. When determining the existence or scope of a duty, a court “should consider a broad range of social, economic, and moral factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff’s conduct at the time of the accident.” Oster v. Department of Transportation and Development, State of Louisiana, 582 So.2d 1285, 1289 (La. 1991). If we were to hold that the manufacturers and/or sellers of equipment and supplies to employers (and others) had a duty to warn about the dangers of bringing the equipment and supplies into contact with high voltage electrical power lines, there would be an infinite number of items that would have to carry such a warning, as, for example, safety lines made of rope covered wire (Dobson), citizen band radio antennae (Washington), paraffin removal trucks (Levi), cranes (Sibley), television antennae (Meche) and metal roof beams (Hebert).
After considering all of the facts and circumstances of this case, and the social, economic and morals factors applicable, we conclude that Lastor did not have the duty to warn asserted by Putman. The judgment of the trial court is correct.
*1230 This assignment of error is without merit.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Putman is cast for the cost of this appeal.
AFFIRMED.

.In brief, Lastor asserts that as a matter of fact and law he is not a manufacturer. For purposes of this opinion, we will assume that Lastor is a manufacturer. Compare La.R.S. 9:2800.53(1), (2); Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La.1974); Marshall v. Beno Truck Equipment, Inc., 481 So.2d 1022 (La.App.-lst Cir.1985), writ denied, 482 So.2d 620 (La. 1986).

. State Farm filed a motion for summary judgment asserting that its policy of insurance did not provide coverage for Lastor. The trial court denied this motion.

. The facts for this motion for summary judgment are found in the depositions of Putman and Lastor filed in the record. In brief, Putman asserts that Lastor's affidavit was also filed with his motion, but it is not in the record before us.

. According to Putman’s deposition, he made a diagram of the Independent yard. However, this diagram is not attached to the deposition and is not in the record on appeal.

. The Louisiana Products Liability Act was enacted by Acts 1988, No. 64, and was not effective until September 1, 1988. Defining a duty is a question of law. Fowler v. Roberts, 556 So.2d 1 (La. 1989) (on original hearing).